JOSEPHINE GILLILAND v. JAMES D. BONDURANT, SR., JAMES D. BONDURANT, JR., and W. P. BONDURANT, doing business under the firm and trade name of PALACE BAKERY, Appellants.—59 S. W. (2d) 679.

Division One, April 20, 1933.

*S. H. Ellison, Andrew Ellison, R. E. Kavanaugh* and *Rieger & Rieger* for appellants.

884

*A. D. Campbell* and *John Campbell* for respondent.

HYDE, C.—This is a suit for damages for personal injuries. The petition contained two counts. The first count was an action at law for personal injuries which plaintiff sustained during her minority as the alleged result of defendants' negligence. The second count is a suit in equity to set aside a judgment, rendered for such injuries during plaintiff's minority, in a suit in which her father was named as her next friend.

The second count was first tried and the trial court entered a decree setting aside the former judgment. Thereafter, the court proceeded to try the action at law stated in plaintiff's first count, and rendered a judgment in plaintiff's favor. Defendants appealed to the Kansas City Court of Appeals and the trial court's decree and judgment was affirmed. One of the judges, however, dissented upon the ground that the opinion in affirming the judgment on the first count for plaintiff's injuries was in conflict with the decision of this court in Gandy v. St. Louis & San Francisco Ry. Co., 329 Mo. 459, 44 S. W. (2d) 634, and Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 20 S. W. (2d) 776. The case was accordingly certified here under the provisions of Section 6 of the Amendment of 1884 of

the Constitution. [Gilliland v. Bondurant (Mo. App.), 51 S. W. (2d) 559.]

Defendants contend here, as they did in the Kansas City Court of Appeals, that plaintiff was not entitled to the decree rendered by the trial court setting aside the judgment in the suit brought by her next friend during her minority. Upon this proposition, we adopt the complete statement of facts and the able decision thereof by the majority opinion in the Kansas City Court of Appeals as follows:

"The *second* count is to *set aside a judgment* rendered in a suit brought by plaintiff's father, as her next friend, against defendants for the damages sustained on account of said injury.

■■ "A demurrer was filed to the *second* count on the ground that the same did 'not state facts sufficient for the granting of the relief therein prayed,' the point of the demurrer is that 'plaintiff did not plead that she had a meritorious case or that the judgment was inadequate.' No doubt the second count does not contain such allegations *in so many words*; but the allegations and statement of facts made therein are such that the above-mentioned matters appear therefrom *as a matter of law*. Two cases are cited in support of the charge that the count is fatally defective, namely, Greenard v. Isaacson, 220 S. W. 694, and Sauer v. Kansas City, 69 Mo. 45, in the first of which it was sought to enjoin the enforcement of a judgment because of fraud in procuring it, and in the other to enjoin the collection of a judgment for taxes. But these cases have no application here, since they deal with situations vastly different from the one involved in the said second count. On the face of the facts stated in the two cited cases, there appeared to be nothing wrong or improper in the judgments sought to be set aside, but not so in said second count of the case at bar, for here the facts alleged, if true, *spoke for themselves*. They not only showed fraud in the procurement of the judgment, but also that the latter was wholly *inadequate* in a case where a young girl had lost her arm through defendants' negligence and was settling, for a mere pittance of $500, not only her own case (for the loss of her arm) but also *her father's* for loss of his child's services. These facts, which were stated, showed fraud and inadequacy in terms far louder and more impressively than any formal statement to that effect could have done. Besides, the second count 'repleads and restates as true all of the allegations of' the first count.

■ "The charge of error in overruling demurrer to the evidence under the second count does not appear in defendants' 'Assignment of Errors,' but as the point is argued and discussed later in the brief, we prefer to consider and pass on it. (Since this count is an equity case, the assignment that 'the court erred in finding for plaintiff on the second count of the petition' is sufficient to raise

the questions discussed.) However, we fail to see wherein the evidence was not sufficient. In the evidence under the second count, it appears that plaintiff's father and the defendants reached a settlement of the claim for damages in May, 1921, and in accordance therewith, an 'agreed judgment' was entered in plaintiff's favor for $500. It seems that plaintiff, being then a young girl between fifteen and sixteen years old, at the request of defendants' *then* attorneys, signed a request for the appointment of her father as next friend, which last request states that it is in order to bring a suit in her behalf. But, in the trial of the said second count (being the action to set aside said judgment), plaintiff testified that she understood from her father that the papers were to be signed in order to settle *his,* and not *her,* suit against the defendants; that she did not recollect reading the papers she signed; that she signed the papers referred to, all of which were drawn by defendants' attorneys (not their present attorneys, however) in their office, they having prepared them prior to her being called by them to said office. As stated, these attorneys *were not the same attorneys who now represent the defendants.* Plaintiff, her father and her mother, also signed receipts and releases reciting the payment of $500 to her father as next friend in settlement of her cause of action, and *also* any cause of action her father and mother might have against defendants. No *express* representations were made to plaintiff as to the contents of the papers by the then attorneys for defendants. There were none needed; plaintiff was a child with no one to advise her, or at least none who did advise her, and those who prepared the suit did not have to take the hazard of *expressly* telling her what they were or of explaining them to her; all they had to do was to merely *keep silent,* and this they did. Defendants' *then* attorneys thereupon filed the suit against defendants (their own clients) in behalf of plaintiff by her next friend; defendants entered their appearance thereto, and, without the hearing of any testimony, judgment was rendered in favor of plaintiff for $500. The judge who rendered it testified as a witness on the trial of the second count, and stated that no one addressed the court except the (then) attorneys of defendants, and that he, the judge, understood and acted upon the understanding that the judgment entered was an 'agreed judgment;' that plaintiff's father was present, but that he, the witness, did not think the father said anything. The evidence under said second count shows that plaintiff was not present. The whole proceeding did not take five minutes. The judgment of $500 was immediately paid, and the $500 was turned over to the plaintiff's father, and plaintiff never, at any time, received any part of it. The evidence, under the said second count herein, also showed that plaintiff's father was afflicted with paralysis agitans that 'affects his mind to a certain extent but not enough but he knew what he was doing.' One of defendants' (then) attorneys testified

herein that, in that suit, no witness was sworn nor evidence given; that he made a statement of facts to the judge, saying it was agreed that judgment be entered 'as it was written up.' The evidence shows that plaintiff *never knew* that any judgment was in her favor and the same counsel appeared on both sides of an adversary proceeding. Hence, no suit in her behalf was brought. [Arrington v. Arrington, 116 N. C. 170.] But it is now urged that no evidence was introduced under the second count to prove plaintiff had a meritorious case. See Robison v. Floesch Const. Co., 291 Mo. 34, 236 S. W. 332; Gurley v. St. Louis Transit Co. (Mo. App.), 259 S. W. 895, in each of which cases there was a trial on the count to set aside judgment, but no effort was made therein to show that the plaintiff had a meritorious case. In the Gurley case the evidence is set forth, and the infant plaintiff was actually present in court, and had a slight opportunity to know (but in fact did not know) that a suit was being brought. But the court held, nevertheless, that the judgment was inherently fraudulent, the plaintiff did not know what was being done and there was no judicial investigation or determination of the issues.

''Moreover, in the trial of the second count in the case at bar, plaintiff's counsel inquired of the court as to whether they should go into the *merits* of the case. The court replied, 'Oh, no, I wasn't trying the merits of the case, don't think counsel had any such *understanding as that, did they?'* Defendants' counsel replied, *'Don't know where they would get it.'* Plaintiff's counsel then said, 'I will not go into the merits of the case.' The court: 'No.'

''However, it was shown there was merit in her case, for the petition written and filed by the defendants against themselves, in the case of the $500 judgment, was introduced in evidence, in the trial under the second count to set it aside; and in it defendants accused themselves of having wrongfully caused plaintiff to lose her arm; and the judgment rendered therein which they had also prepared upheld the allegations of the said petition.

''Besides, the fact that the defendants' *then* attorneys prepared all the papers in the case, including the form of the judgment, and were the only attorneys in the case and representing both sides which were *adverse* to each other, is sufficient to render the $500 judgment void and calls for setting it aside. [Marcom v. Wyatt, 23 S. E. 169; Walker v. Grayson, 10 S. E. 51; Parker v. Parker, 99 Ala. 239; In re Boone, 83 Fed. 944, 957.]''

██ ██ To this it may be added: The settlement (by an agreed judgment), of a suit for an infant by a next friend represented by his own counsel, may be permitted to stand where such a counsel is safeguarding, in good faith to the best of his ability, the interest of his immature client (even then it is the court's duty to protect the infant's interest by judicially ascertaining the facts, through a

real hearing and consideration of them); but all authorities are unanimous in holding that no judgment in such a case will be permitted to stand when, upon a direct attack by a suit to set it aside, it is shown that the infant had no counsel in fact, and that the pretended suit for the infant was brought by attorneys representing the adversary. [Robison v. Floesch Construction Co., 291 Mo. 34, 236 S. W. 332, 20 A. L. R. 1239, note, 1249; Carroll v. Atlantic Steel Co. (Ga.), 106 S. E. 908, 15 A. L. R. 660, note, 667.] In this case, the attorneys, who brought the infant's suit, did as directed by the insurance adjuster who employed them to provide, as a means of concluding plaintiff's rights through a legal form (as said in the Robison case, supra), "a screen contrived to conceal the real transaction, the contract of settlement and release between plaintiff and defendant, and having for its purpose the foreclosure of plaintiff's right to disaffirm . . . upon reaching the age of discretion, or upon the receipt of mature counsel." Such a suit is not a suit in fact, and as a screen it is only a smoke screen, which disappears in the light of the true facts and fails to prevent the searching eyes of a court of equity from clearly seeing the real transaction. So seeing, equity will declare it nothing and allow a real suit to proceed.

 After the court entered its decree setting aside the judgment in the former suit as prayed for in plaintiff's second count (which decree we now affirm), the parties entered into the following stipulation concerning the trial of plaintiff's first count:

"The parties, plaintiff and defendants, agree that the cause of action stated in the first count of plaintiff's petition shall be submitted to the court, jury waived. If at the close of the case the court is of the opinion the plaintiff has made a case entitling her to have the case submitted to a jury if a jury was trying the same; that is, if the plaintiff has made a case good as against a peremptory instruction to find for the defendants, then and in that event the court shall render in favor of the plaintiff for the sum of $4500. If the court is of the opinion that the plaintiff has not made a case good as against a peremptory instruction, then judgment shall be entered for the defendants.

"It is further agreed that either party, that is, plaintiff or defendants, may appeal from the judgment of the court, the same as if this agreement had not been made and nothing in this agreement shall be construed to be a waiver of the defendant's right to assert the exceptions previously made in this cause in the trial of the second count, and to the action of the court in overruling defendant's demurrer to the second amended petition and in overruling defendant's motion to strike part of plaintiff's said second amended petition, and in overruling defendant's motion to require plaintiff to elect."

Plaintiff's first count was for damages for the loss of her right arm in an ice crushing machine operated by defendants when plaintiff, with other members of a high school class, went upon defendants' premises to see the operation of their bakery and creamery. Plaintiff alleged that the class went there "at the invitation and with the permission and knowledge of defendants;" and further alleged "that continuously for several years immediately preceding the aforesaid injury, a large number of classes of students of the public schools of the said city of Kirksville, . . . did at the invitation and with the knowledge and consent of defendants, go to said defendants' establishment to look at and observe the aforesaid machinery and manner in which the same was operated and, did there, under the direction of defendants, look at, and observe said machinery and the manner in which the same was operated."

Plaintiff's petition described defendants' ice crusher and the revolving prongs therein; and then charged negligence as follows:

"That at all of said times defendants herein knew, or by the exercise of ordinary care on their part could and would have known that for plaintiff and other members of her class to be picking up with their hands pieces of said crushed ice from the place where the same was deposited by said ice crushing machine as aforesaid, was extremely dangerous and hazardous, and liable to result in the arm, hand or clothing thereon of plaintiff or such other members of her class being caught by said prongs, and the arm and hand pulled into and crushed in said machine.

"That notwithstanding said knowledge of said danger and hazard to plaintiff and the other members of her class, defendants negligently and carelessly *failed to warn plaintiff* or the other members of her class of said danger, or advise them, or either *of them of the existence of said prongs or of any danger incident to the picking up of said pieces of crushed ice;* that during *all of the time plaintiff was in said basement* looking at, and observing said machinery and the manner in which it was operated as aforesaid, *defendants were engaged in operating said machinery and in showing and demonstrating to plaintiff and her said class the manner in which the same operated and produced the product manufactured by defendants.*"

Plaintiff further alleged that she and others in the class "did, with the knowledge of defendants, pick up with their hands pieces of said crushed ice from the place where the same were deposited;" that "she did not know of the existence of said prongs, or of any danger therefrom or of any danger of being caught by said prongs;" "while defendants were still engaged in operating and demonstrating the manner in which said machinery was operated," she picked up another piece of ice; and that her arm "was caught by said prongs and thus pulled and forced into said machine."

Defendants' answer, in addition to a general denial, specifically

denied any invitation by defendants, alleged that the visit was for the exclusive benefit of plaintiff; that plaintiff was warned of the danger of all moving machinery; and alleged contributory negligence on her part.

Under the stipulation concerning the determination of plaintiff's right to damages for her injuries, there is really only one question to be considered here, that is, whether or not the trial court should have sustained a demurrer to the evidence. This was the only question for either the trial court or the appellate court. Both plaintiff and defendants introduced considerable evidence to show what they claimed were the true facts. This evidence was conflicting. Although it is argued by defendants, here, we are not, nor was the trial court, concerned with this conflict, nor the weight and credibility of the evidence. The rule, under which the sole question in this case must be determined, is that "the whole evidence, whether offered by plaintiff or defendants, must be searched and the plaintiff given the benefit of any and all facts and circumstances favorable to or tending to support her theory of the case and every reasonable inference deducible therefrom, while evidence on the part of and favorable to the defendants, which is contradicted, must be excluded." [Gray v. Columbia Terminals Co., 331 Mo. 73, 52 S. W. (2d) 809; see, also, Armstrong v. Mobile & Ohio Railroad Co., 331 Mo. 1224, 55 S. W. (2d) 460; Grubbs v. Kansas City Pub. Serv. Co., 329 Mo. 390, 45 S. W. (2d) 71.]

We will, therefore, undertake to state the facts which we think the evidence, viewed in this light, tends to show. Defendants operated a bakery and creamery, doing a wholesale and retail business over several counties, in bread, ice cream and butter. Their plant was equipped with up-to-date appliances and machinery for handling their products in a sanitary manner. They widely advertised that their products were not touched by human hands. Inspection of their appliances and their methods of making their products, by those who might be prospective customers, was encouraged. For that purpose, they had on their window a sign stating "Inspection Invited." It was shown that classes of students, about five or six classes each year, from the Kirksville high school and grade schools, from the State Teachers College and the American School of Osteopathy, also located in Kirksville, were annually taken through defendants' plant and shown their appliances and methods. It is a reasonable inference from the evidence that this was one of defendants' methods of advertising their products; that it was done through arrangements with the school authorities to bring classes there; and that they were brought there in connection with and as a part of their school work, not out of mere curiosity on the part of the children to watch the wheels go 'round. These classes came by appointment and "generally had some object in view, be first on one subject and

then another, be either butter making or ice cream making." Samples of ice cream were frequently given to these classes. When an appointment was made, defendants instructed their employees about the demonstration the class was coming for, to specially clean up the place and have things in readiness, to have as little machinery running as possible, and to give demonstrations of their work. Mr. Pierson, who supervised defendants' ice cream and butter department, said he "instructed them like any teacher would a class of students in school."

One of the classes, which annually came to receive instruction in defendants' establishment to learn about the handling of butter and other dairy products on a commercial scale, was the girls' class in household economics of the Kirksville High School. Plaintiff, as a member of this class, went to defendants' establishment on the day she was injured. An appointment had been made by the teacher of the class to go there at 1:30 P. M. Plaintiff first received information concerning going to defendants' place of business from the teacher after the class had assembled at the school building. Plaintiff was fifteen years and five months old at the time and a sophomore in the high school. There were between eighteen and twenty girls in the class. Upon their arrival at defendants' plant, one of the defendants took them through the bakery on the upper floor and showed them how the bread was mixed, baked, and wrapped. They went to the basement where the dairy products were handled and were first taken to the cold storage room and instructed by the defendants' foreman as to the handling of milk and cream. From the cold storage room, they were taken to the churn, which was operated by electric power. To reach this churn from the cold storage room, they went about twenty feet in a southwesterly direction. About ten or twelve feet to the north of the churn, nearer the cold storage room, was an ice crushing machine. The direct route from the cold storage room to the churn took them within ten feet of the ice crusher. Upon a concrete foundation, between the churn and the ice crusher were power driven separators and a clarifier. Also between the churn and the ice crusher was a switch, which turned on the power, operated by a lever "like an old saw mill slide." When the power was turned on, it revolved the shaft which operated both the ice-crushing machine and the churn. It was possible to stop the churn, without turning off the power, but to stop the ice crusher, the power which operated the shaft had to be turned off.

The ice crusher was a square affair standing up like a coffee mill from two and one-half to three and one-half feet high. It had an opening on the top in which cakes of ice up to about fifty pounds were placed. They dropped down into the middle of the machine and were crushed. It had a solid steel case all around except that there was a place along the bottom open for the crushed ice to come out,

like a grate in a furnace where ashes are taken out. The top of this opening was from fifteen to eighteen inches above the floor. Inside the steel case was a round cylinder like a threshing machine cylinder with a tube on it something like a separator. There were teeth or prongs in the bottom of the cylinder inside the crusher which were not visible from the outside. These teeth or prongs carried the crushed ice to the front of the opening, threw large pieces outside and deposited the small ones in the bottom of the opening. When there was a considerable amount of ice crushed, it piled up on the floor' in front of the opening and sloped gradually back into it. The teeth or prongs could not be seen without looking up under the opening. The lower end of them were about thirteen and one-half inches above the floor and about eleven inches from the front of the opening. There was a flywheel on the side of the crusher about thirty inches in diameter protruding out in front about four inches; the belts which operated the shaft were encased in wire netting. The flywheel was on the same axle as the cylinders on the inside of the crusher and when the crusher was operating the flywheel and belts could be seen moving. A three-cornered piece had been broken out of the front of the crusher, something like seven inches high and six or seven inches across the corner. ''Before that piece was broken out, one could not have been caught by those prongs or teeth without they reached up in under the encasement.'' Defendants' foreman said that defendants were to order a new piece to fix the crusher but never did so, but that they did have ''a light piece of tin put across there. It was just a light piece of sheet iron brought down over that space clear across that space, the broken part. It was off when plaintiff was hurt—rusted off—and had been for six months or a year.''

When plaintiff's class went into the cold storage room, a number of the girls picked up ice in the opening of the ice crusher. They ate these pieces of ice and picked up more when they came back from the cold storage room to the churn. It is reasonably inferable from the testimony that Pierson saw members of this class reaching into the crusher for ice; had seen members of other classes do so; and had reason to expect that members of plaintiff's class would continue to do so as long as they were near it. The class all stood around the churn while defendants' foreman opened it for them to look into, explained its operation and started the power to show its operation. No machinery in the basement had been running during their visit up to that time. There was some conflict about the size of the pile of ice in and around the opening of the ice crusher and whether the ice outside on the floor was dirty. Plaintiff's evidence was, however, that she and the others picked up small pieces of ice inside the opening of the machine only. Plaintiff said that a few minutes before she was caught in the crusher she looked at

the butter in the churn and saw defendants' foreman put the churn in motion; that she did not leave the class at the churn; and that they were not observing the contents of the churn when she reached into the ice crusher for another piece of ice and was caught. Her arm was crushed so that it had to be amputated. She said she had received no warning that there was any danger from the ice crusher, or in picking up ice from it, and did not know that it was in motion when she attempted to get another piece of ice from it.

Defendants' foreman, Pierson, testified to three separate, distinct and inconsistent ways in which he said the accident occurred.' He was corroborated by another one of defendants' employees who was in the basement at the time, as to the third way he stated it. Plaintiff called Pierson as a witness and, upon direct examination, only asked him to describe the ice crushing machine, the other machinery and its operation, the custom of receiving and instructing school classes, and his instructions from defendants about them. Upon defendants' cross-examination he told of the occurrence as follows:

"I showed them the butter first—the churn was all set; I raised the lid and showed them the butter. Now, I says, I will throw the switch in and never saw nobody but the class, I stepped over here (indicating) and threw it in gear and the churn went to going, and then as soon as I threw the churn in gear I heard the scream and turned around and here the girl was sitting in a hunkered position. I run back and turned the switch."

Later he was examined by the court and gave a second version as follows:

"THE COURT: During this time they had been in the basement neither the ice machine nor the churn was not in operation until at some time there you wanted to show the operation of the churn? WITNESS: Right. THE COURT: Then you stepped between the ice machine and the churn and threw on the switch? WITNESS: Right. THE COURT: That started both of them? WITNESS: Right. THE COURT: Now how close to the time of your turning on the switch did you learn that the plaintiff was injured, or hear her cries? WITNESS: Well probably three minutes, or—oh, a very short time."

Upon further cross-examination, with reference to his former written statement, his third account was that he had shut off the power and returned to the churn before plaintiff was injured. His testimony then was, as follows:

"Q. Tell the court whether it is a fact that you had shut off the power and that the machine was simply operating on its own momentum at the time of this accident? A. It was on its own motion. Q. That's correct, isn't it? A. That's right. Q. The power was not on at that time? A. The electric power, no, I guess not, that right anyhow. Q. Now this flywheel and these teeth would

have only operated and did only operate and revolve for thirty seconds after the power was shut off. A. It has never been timed—something like that in my judgment.''

The jury, of course, would have been justified in believing that the accident happened in any one of these three ways, or in deciding that defendants' foreman did not know how it happened, disregarding his testimony about it entirely, and basing their finding of how it happened on other testimony.

■ Defendants filed a motion to elect on the theory that plaintiff's petition pleaded two causes of action in the same count, one based on plaintiff being an invitee, and one based on being a licensee. The trial court overruled the motion and while the matter does not seem to have been preserved for review we think that the motion should have been overruled. We say this, because we think it is necessary for us to decide what is the theory of plaintiff's petition. As hereinabove stated, the language of the petition is that she and her class and the other classes in former years went to defendants' establishment ''at the invitation and with the permission and knowledge of defendants.'' This is not alleged in the alternative. The lesser (permission) is included in the greater (invitation). We hold that plaintiff alleged a status of invitee and charged negligence upon the basis of defendants' duty (failure to warn of danger) to her as an invitee. Her case must, therefore, stand or fall upon that theory. The majority opinion of the Kansas City Court of Appeals, after finding there was evidence tending to show that plaintiff was an invitee, said that ''in this case, it makes no difference whether plaintiff was an invitee or a licensee; the defendants' duty toward her was the same.'' The court's theory was that there was evidence of active negligence, namely, ''that Pierson negligently put the crusher in motion knowing, or being under the duty of knowing before doing so, that plaintiff was in the act of picking up ice.'' The court thought that the allegations of the petition were broad enough to cover this theory of negligence and that even if not, that the petition should be treated as amended because defendants offered no objection to the evidence sustaining that theory and joined in trying it ''as if it were in the petition.''

■ The dissenting opinion took the view (we think correctly) that a recovery upon this theory could not be allowed because it constituted ''a fatal variance between the evidence and the allegation of the petition.''

This dissenting opinion says:

''It is true that the evidence that the machine was started up by Pierson without warning was admitted without objection of defendant. The failure to object does not show that they were trying the case on the theory that the starting of the machine, without warning, was pleaded in the petition, for there was no burden upon

defendant to object to evidence introduced in behalf of plaintiff, which disproved her pleaded case. Under the latest decisions of the Supreme Court, merely because defendant failed to object to the testimony referred to above, this case cannot be considered here as having been tried by it on the theory that the petition pleaded that the machine was started without warning as plaintiff was about to insert or had inserted her hand into it. [Gandy v. St. Louis-San Francisco Ry. Co. (Mo. Sup.), 44 S. W. (2d) 634, 638; Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 20 S. W. (2d) 676.]''

The Gandy case and the Kitchen case both held that it was reversible error for a trial court to give an instruction authorizing a recovery upon a theory of negligence not pleaded. This case never reached the point of broadening the issues by instructions, because under the parties' stipulation the only question to be determined was whether or not a demurrer to the whole evidence should be sustained. But when a plaintiff pleads a cause of action based on nonfeasance, the negligence of defendants in failing to perform a duty which they are alleged to owe her as an invitee, to warn her of danger (which is an affirmative duty to use care for her safety), it would seem to be fundamental that the proof of an entirely different cause of action based on misfeasance, the violation of the duty, which they are alleged to owe to her as a licensee, not to wantonly injure her by turning on a power crusher when defendants' employee saw, or could have seen by looking, that she had her hand inside of it (a negative duty not to commit a negligent act which would injure her when in a position of peril), would be a fatal variance between pleading and proof. [45 C. J. 1062-64, secs. 633-35, also p. 1143, sec. 735; 49 C. J. 804-12, secs. 1187-91.] The stipulation, that plaintiff was entitled to recover if she made a submissible case, undoubtedly meant if she produced sufficient evidence to prove, if believed, the case alleged in the first count of her petition, and not some other case she might have alleged if she had it to do over again.

Since plaintiff's petition proceeds upon the theory that plaintiff was an invitee, if, upon a consideration of the whole evidence in the light most favorable to plaintiff, we can say that there were sufficient facts and circumstances to show, if true, that plaintiff was an invitee, then all the other matters discussed by the Kansas City Court of Appeals concerning the liability of defendants to plaintiff if she was only a licensee are eliminated. Defendants rely upon Benson v. Baltimore Traction Co. (Md.), 26 Atl. 973, to sustain their position that plaintiff was only a licensee. As stated in that case:

''The authorities appear to have classified this subject under these heads, to-wit: '(1) Bare licensees or volunteers; (2) those who are expressly invited or induced by the active conduct of the defendant to go upon the premises; (3) customers and others, who

go there on business with the occupier. Each case must largely depend upon the circumstances attending the occurrence, and it is not infrequently found to be difficult to determine whether the injured party is a mere licensee, or whether he is on the premises by the implied invitation or enticement of the owner or occupier.'' [26 Atl. l. c. 975.]

Corpus Juris states the distinction between a license and an invitation thus:

''A license is distingushed from an invitation in that the licensee is on the premises by sufferance only, and not by virtue of any business or contractual relation with, or any enticement, allurement, or inducement to enter held out to him by, the owner or occupant, but merely in his own interest and for his own purposes, benefit, convenience, or pleasure.'' [45 C. J. 789-90, sec. 194.]

██ ██ It, however, makes no difference in the owner's duty to the invitee whether the invitation is express or implied. [45 C. J. 808, sec. 218.] An implied invitation is defined as ''one which is held to be extended by reason of the owner or occupant doing something or permitting something to be done which fairly indicates to the person entering that his entry and use of the property is consistent with the intentions and purposes of the owner or occupant, and leads him to believe that the use is in accordance with the design for which the place is adapted and allowed to be used in mutuality of interest.'' [45 C. J. 809, sec. 220.] ''However, it is not sufficient that the user believed that the use was intended, but in order to occupy the status of invitee, he must show that there was some act or conduct of the owner or occupant which afforded a reasonable basis for such belief. An invitation may be implied from dedication, customary use, or enticement, allurement, or inducement to enter. It may be manifested by the arrangement of the premises or the conduct of the owner.'' [45 C. J. 810, sec. 220; see, also, Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.) 1045, 17 Ann. Cas. 576.] The owner's duty to an invitee is to take ordinary care to prevent his injury. [Glaser v. Rothschild, supra.]

██ Ordinarily, one who because of his own inclination, goes into an industrial plant merely to observe its operation, to satisfy his own curiosity or to learn how it operates solely for his own benefit is a licensee only, regardless of whether he wanders around by himself or is, through the owner's curtesy, furnished a guide. Under those circumstances, it seems to be plain that, unless some further duty is imposed by statute, the only duty of the owner is that he must not wilfully or wantonly injure him, or knowingly let him go into a hidden peril, or otherwise, by an affirmative negligent act, injure him after his presence is or should be discovered in a position of danger. He owes him no affirmative duty of care to protect him. [45 C. J. 796, sec. 201; also secs. 207-212.]

In Weaver v. Carnegie Steel Co. (Pa.), 72 Atl. 552, 21 L. R. A. (N. S.) 466, where one of a group of visitors in a steel mill fell through an opening in the floor, it was said:

. ''In the present case permission was sought and obtained in behalf of the body of gentlemen who were visiting the mill. The object of the visit was to afford pleasure and benefit to the visitors; so that the facts show merely a case of license upon the part of the owner. There is nothing in the record to show that appellant was invited or induced by any act of the defendant to visit the steel mill, but it does appear that he went there entirely for his own personal gratification.''

Likewise, in another case, it was stated:

. ''A mere sightseer, on no other business, goes into any one of the large modern factories in operation throughout the civilized world. It requires great care and watchfulness on his part, unfamiliar as he is with such places and things, to avoid danger and escape injury, although the place is reasonably safe and fit, and everything is carried on with due ordinary care; but unless there is wanton injury, the result of gross negligence, the owner is not liable. Why? The owner has set no trap for him; he did not induce, but only permitted, him to come; he is not there on business; the place and appliances belong to the manufacturing company; it was fixed for them and their employees; it suits them; by their knowledge and skill they avoid danger, though to those unskilled and unfamiliar it may be dangerous, —dangerous to any one in fact; but it was not made for, and is not carried on for, any purpose with which the licensee has anything to do; if the injury is not wanton, the negligence is not gross, and the company is not liable, for it owed him no other duty, and that one has not been violated.'' [Myers v. Gulf Public Service Corp. (La.), 132 So. 416; Poling v. Ohio River Railroad Co. (W. Va.), 18 S. E. 782, 24 L. R. A. 215.]

In a number of cases this rule has been applied where a class of students come with their teacher for the purpose of seeing the operation of machinery. [Benson v. Baltimore Traction Co. (Md.), 26 Atl. 973; Castonguay v. Acme Knitting Machine & Needle Co. (N. H.), 136 Atl. 720; Myers v. Gulf Public Service Corp. (La.), 132 So. 416; Roe v. St. Louis Independent Packing Co., 203 Mo. App. 11, 217 S. W. 332.]

However, these were all cases of isolated visits. In none of them, was it shown that the visit described was, as here, pursuant to a long established custom for the same class and similar classes to go there; that the visit was for the purpose of receiving instruction from the owner's employees as part of the school work of the class; that the owners of the plant visited did anything to indicate a desire to have the visit made; or that the visit was in any way related to any purposes of the proprietors. In the Benson case the members

of a manual training class, after having been shown through the premises by an employee, were permitted to look around for themselves and plaintiff, there, was injured while so doing. The defendant company was only asked by the school principal to grant permission to the class to visit its power house. The court said that the granting of the permission was clearly a mere license "to an examination of the works and machinery in the power house, for the purpose of gratifying their curiosity or of improving their knowledge of the workmanship of the machinery and of the manner in which such power was applied in moving the cars upon the streets of the city," and that no benefit could accrue to the defendant. In the Castonguay case the decision was put upon the ground that the manager who gave permission for the students to visit defendant's mill had no authority to invite anyone there. That case does not apply here, because arrangements for classes were shown to have always been made with the defendants themselves.

In the Myers case a chemistry class was taken to an ice plant. It was expressly shown that there was neither a special nor a standing invitation to bring classes there and that the class was not brought there for advertising purposes. The court, in holding they were licensees, said:

"The visit was in no sense or degree for the interest or benefit of the defendant, nor was it made at the suggestion of the defendant or any of its employees. The request for the permission to make the visit of observation came from the chemistry class and its members as represented by the teacher of the class and the principal of the high school. There was no common interest or mutual advantage. The benefits to be derived from the visit were educational and were to inure solely and strictly to the benefit of the visiting members of the class, and in no way, directly or indirectly, did the defendant benefit by it. It was a pure accommodation and inconvenience on the part of the defendant and its employees."

In the Roe case, decided by the St. Louis Court of Appeals, a Y. M. C. A. class, designated as an observation class, was taken through defendant's packing plant. It was shown that the visit was "purely educational, for the education of the boys themselves" and that it was "not for any advertising purpose of the plant itself." It was argued that plaintiff was an invitee because there was some benefit to the defendant from the visit; "that a recognized, practical method of advertising, and one of the best means for increasing business is to get the general public to visit a mercantile or manufacturing plant for the purpose of acquainting them with the modern hygienic system of conducting same, as well as familiarizing the visitor with each department and the operation thereof; that such visits on the part of the public result in benefit to the company whose plant is thus inspected is generally admitted, though the benefit that

may accrue to the company out of the visit of any particular individual 'may be long delayed.' ''

The court, however, said concerning this argument:

''What might be the rule that should be applied to a case where the facts used as the hypothesis of appellant's argument were established by the record in the case, namely, that the manufacturing plant openly advertised and extended an invitation to the public to visit its plant, and for such purpose furnished employees to act as guides to such of the general public who accepted such invitation, is a question which under the facts in this case it is not necessary for us to decide, for we have no such case before us.'' [Roe v. St. Louis Independent Packing Co., 217 S. W. l. c. 337.]

It would seem that we do have for decision here the exact hypothetical case stated by the St. Louis Court of Appeals. The majority opinion of the Kansas City Court of Appeals correctly said upon this subject:

''It was also in evidence that for several years prior to the plaintiff's injury it was defendants' business plan to invite the public generally, and to arrange for, or have 'appointments' with, classes from the various schools in Kirksville, some five or six times a year, to visit their place of business to witness the manner in which they prepared their products, 'and it was our duty to tell them how and why we produced our stuff in the condition that we did.' When classes came, 'they were taken to the place of instruction.' When they were to look at a 'demonstration of ice cream freezing, I took them to the freezer and showed them how it was frozen and how it came out of the freezer, and where we put it in the hardening room.' Samples of ice cream were given the classes. Defendants would always call attention to the care exercised by them to keep sanitary the methods of preparation of their products. In other words, the *facts themselves show* (no matter what anybody may or may not say) that defendants invited and gave permission to students and others to visit their place of business and observe the manner in which it was conducted and their products made, this being for the purpose of effectively advertising their business. At the time plaintiff was injured, and continuously for several years before that date, there was in the window of defendants' place of business a sign reading 'Inspection Invited.' It is urged that there is no evidence to show that plaintiff ever saw this sign or came to the place of business in response to the invitation contained therein, and the intimation is she could not be regarded as an invitee. However, the evidence is she did see it and had seen it at times when she had gone there to buy milk, sold in the front room. But the sign shows, and so does the treatment and attention given to those who did come, how defendants regarded their coming and what the purpose was in extending such invitation. Whether plaintiff's coming was in *direct*

response to and acceptance of this direct and also implied invitation need not be expressly or *affirmatively* proved, since it seems that it was certainly because of the custom of defendants to have persons do so, and defendants' manner of receiving them and of showing special attention to them when they did come. So that an implied invitation to use premises arises when a benefit accrues to the owner thereof from such use or when the use is in the interest of both parties or is connected with the owner's business; and the duty of the owner of premises towards another who goes thereon as the result of an *implied* invitation is the same as if that person went thereon as the result of an *express* invitation. [Cleveland, C., C. & St. L. R. Co. v. Powers, 173 Ind. 105, 88 N. E. 1073, 1077, 89 N. E. 485; 3 Sherman & Redfield on Neg. (6 Ed.) sec. 706.] As shown hereinabove, there is evidence tending to show both an express and an implied invitation.''

We agree with this conclusion and find that there is substantial evidence to so show. While the status of an invitee will not be accorded by permission to enter on or use the property, in the absence of any real benefit to the owner, yet where there has been a custom for persons to enter on the premises for certain purposes with the acquiescence of the owner, an invitation will be implied, although an invitation will not be implied from occasional use. [45 C. J. 821-22, sec. 231; see, also, Fleishmann Malting Co. v. Mrkacek, 14 Fed. (2d) 602; Richmond & Manchester Ry. Co. v. Moore (Va.), 37 L. R. A. 258; Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.) 1045, 17 Ann. Cas. 576; see, also, 27 A. L. R. 1018, note, following case of O'Rourke v. Marshall Field & Co. (Ill.), 138 N. E. 625, 27 A. L. R. 1014.]

The evidence here not only tends to show a general invitation to the public generally as prospective customers, as part of defendants' advertising methods, to inspect their plant, but it tends to show, by their long continued custom of bringing school classes there and in furtherance of the same purposes instructing them as a part of their school work, a special inducement to the school authorities to bring them. It also tends to show more than a visit to gratify the desires of the students. Plaintiff was given no choice in the matter. When she and her class were assembled for their regular class work, they were told that their class work that day was to be in defendants' creamery. They were school children, under school discipline and taken to defendants' premises, so far as they were concerned for school purposes. As stated in defendants' brief this ''was a part of their school work, it was not a lark or holiday.'' They were instructed there by defendants' foreman just as they would have been by their teacher at the high school. From the long-established custom of bringing this class and other classes there annually and instructing them in butter making and ice cream making just as any

class is instructed in school, the jury would be justified in believing that such an arrangement of long standing grew out of and was based upon some benefit to defendants and implied an invitation to the school authorities.

 Having determined that there was evidence to justify finding that plaintiff was an invitee, we hold that the trial court was right, in holding that a submissible case had been made, because of the duty to an invitee to take ordinary care to prevent his injury. [Glaser v. Rothschild, supra.] The testimony of defendants' foreman shows that he knew that fifteen-year-old high school girls would pick up and eat ice. There was no reason, as defendants suggest, why he would expect them to eat only one piece. The ice crusher and the churn were only three or four steps apart. Accepting defendants' theory that Pierson had shut off the power and the crusher was operating on its own momentum, it is obvious that high school girls of fifteen years of age could not be expected to know that the crusher was operated upon the same shaft which operated the churn, and that unless the power was completely shut off, even though the churn had stopped, the dangerous, hidden prongs would still be revolving inside of the ice crusher. More than that, this ice crusher was, at that time, particularly dangerous because a piece had been broken out of the front, which enabled one to reach into it and be caught by the prongs. It was shown this regrettable accident could not have happened, had it been in its normal condition. Due care, under these circumstances, to prevent injury to these young girls required that they be warned of its dangers before taking them to a place where they would be so near it when it was in motion.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.