Nels C. MOSS, (Plaintiff) Respondent,

v.

NOOTER CORPORATION, (Defendant) Appellant.

No. 30550.

St. Louis Court of Appeals.

Missouri.

March 21, 1961.

F. X. Cleary, Paul S. Brown, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for appellant.

Edmund W. Albright, William L. Mason, Jr., St. Louis, for respondent.

RUDDY, Judge.

Plaintiff brought the present action to recover damages for personal injuries sustained while on defendant's premises making a delivery of materials. At the close of plaintiff's evidence the trial court directed a verdict in favor of defendant. Thereafter, the trial court sustained plaintiff's motion for a new trial and defendant appeals.

The first point relied on by defendant presents the contention that plaintiff at the time he was injured exceeded the bounds of his invitation and that at the time and place of the accident plaintiff was a licensee and not an invitee. Defendant further contends that it was not liable to plaintiff as a licensee for his injuries, absent a showing that it wantonly injured plaintiff or that it was guilty of active negligence. Defendant asserts neither showing was established by plaintiff's evidence. This contention requires a statement of the facts and circumstances preceding and accompanying the accident which caused plaintiff's injuries.

Plaintiff was employed by the Simpson Transfer and Express Company as a truck driver. On January 11, 1954, he delivered a load of steel bulkheads and steel sheets to the plant of defendant. Plaintiff described the weather as very cold, stating it was about 15 degrees above zero. Upon reaching defendant's plant and premises with the materials, plaintiff stopped at the receiving room of defendant located on Second Street. The foreman of the receiving room determined where the material should be placed and told a Mr. Bauer, an employee of defendant, to accompany plaintiff and show him where the materials should be delivered. Plaintiff testified that he made deliveries to the plant of defendant before the date of the accident and on such occasions he would get his instructions from the receiving room as to where in defendant's plant deliveries were to be made. Sometimes the foreman would send an employee of defendant with plaintiff and on other occasions he would find the place of delivery without a guide. Plaintiff admitted there was a door in the receiving room leading into the plant which had a sign on it stating, "No Admittance."

Plaintiff, accompanied by Bauer and under his direction, drove his tractor-trailer truck to a place inside the plant of defendant where tanks were being made. There the steel bulkheads were unloaded from the truck by means of an overhead crane. This occurred, as stated, inside defendant's plant at a place described by plaintiff as Door 32. After the unloading of the bulkheads was completed, plaintiff, again accompanied by Bauer and under his direction, drove the truck with the steel sheets thereon to Gate No. 9 on defendant's premises. The entrance on defendant's premises

that led to Gate No. 9 was located on Miller Street. It appears that the building which contained defendant's plant was a short distance north of Miller Street and that the designation of "Gate No. 9" came from a large figure 9 that appeared over one of the entrances to defendant's plant.

Plaintiff was directed by Bauer to back the truck through the entrance leading to Gate No. 9 into an areaway or driveway that extended from Miller Street to the aforementioned entrance to defendant's plant. Plaintiff backed the truck into this areaway or driveway as directed and stopped the truck on defendant's premises, but did not drive it inside the door of the entrance to the plant. This backing maneuver left the rear end of the truck to the north and the front end facing south. Bauer was in the cab of the truck operated by plaintiff while plaintiff was backing into the area described.

The area into which plaintiff backed the truck was flanked on both sides with steel sheets stacked in piles of various heights. The first pile of steel sheets immediately west of the driveway and the truck was approximately 6 or 7 feet high. Plaintiff in his testimony, when referring to this pile of steel sheets, said, "It was too tall for me to see over by standing on the ground." The width of this pile of steel sheets was about four feet and the length of the sheets varied from 15 to 20 feet, causing the ends of the pile to be uneven. The sides of the pile were straight.

Plaintiff further testified that there was a ladder leaning against the pile of steel. West of the first pile of steel sheets and within a few inches of it was a second pile about as wide as the first pile, however, 3 to 3½ feet lower than the first pile. Between 150 feet and 190 feet west of the parked truck there was a fire, variously referred to by the witnesses as a canned, barrel or stove fire.

The steel sheets on the truck plaintiff was driving had to be removed by means of an overhead crane. When plaintiff stopped the truck in the driveway Bauer got out of the cab of the truck and told plaintiff, "I will have to go get the crane to take it off." Plaintiff testified that he would not unload the steel sheets. After the steel sheets were unloaded, it was his intention to return to his employer for further orders as to deliveries of materials. Plaintiff said the overhead crane used in unloading the steel sheets ran on overhead tracks and covered a space he described as "a sort of a storage space." The crane would lift the load of steel sheets off of the tractor-trailer truck and deliver it to its assigned storage spot. Plaintiff presumed that when Bauer told him that he would have to go get the crane to take off the load of steel sheets that he meant he was going after the crane operator. On cross-examination he testified that Bauer said, "I will have to get the crane. I will have to round up the crew and get the crane." He further said Bauer did not tell him to wait and admitted he knew that the only way to get the load of steel sheets off his truck was by means of the crane. He further said, when Bauer told him he had to round up the crew and get the crane, that Bauer was not telling him anything he did not know; that this had been the procedure on previous occasions.

After telling plaintiff this, Bauer then climbed up the ladder which was leaning against the first pile of steel sheets, went over the top of the first pile and, according to plaintiff, then disappeared over the pile and was out of his sight. Plaintiff knew Bauer was going for the crane operator.

Plaintiff further testified that thereafter he waited outside (evidently in the truck or in the area of the truck) about ten minutes and then, because of the cold, went through a small door in Gate No. 9 to the inside of the plant where it was warmer. After spending a few minutes inside the plant, plaintiff then went outside to see if Bauer had returned. Finding that he had not, plaintiff "started looking for him." In connection with this search for Bauer, plaintiff testified he went up the ladder

leaning against the first pile of steel sheets and when he got to the top of the pile he looked over the area within his view and saw Bauer standing by the fire, heretofore described. Plaintiff testified that he called to Bauer and then said, "he couldn't hear, because of the din in the factory, and * * that distance, and he couldn't possibly have heard me * * *." When Bauer did not respond plaintiff determined to go to him. Plaintiff observed a "cleated board" extending from the first pile of steel sheets to the second pile. It will be remembered the second pile was 3 to 3½ feet lower than the first pile. Therefore, the "cleated board" was extending at an angle. The higher end of the board was leaning on the pile on which plaintiff was standing and the lower end was resting on the second pile. This board or "ramp," as it was sometimes called by plaintiff and his witnesses, was described as 2 inches in thickness, 10 inches in width and 8 to 10 feet long. Pieces of wood had been fastened across it at various distances, giving it the cleated effect referred to by the witnesses. The higher end of the board was on the pile on which plaintiff was standing. Plaintiff was asked if there was anything securing the cleated board to the pile of steel sheets on which he was standing and he answered, "I didn't see anything." He further testified that after he fell he saw nothing securing it to the higher pile. Plaintiff said he saw nothing securing the bottom of the cleated board to the surface of the second pile of steel sheets before he fell or after he fell. When asked if the board was fastened, he answered, "I didn't see anything at that time." In his cross-examination he again admitted that the lower end of the board was resting on top of the second pile. In another part of his testimony, when he was asked if he saw whether the board was "fastened down," he answered, "No, sir, and I didn't see that it was not." In still another place in his testimony he said as far as he knew "apparently nothing" was holding the board. Plaintiff then testified that the board "looked like it was walkable."

He further testified that he weighed 250 pounds but was not apprehensive about walking on this sloping board. He did not think there was any danger. He did not know if Bauer had used the board when he went over the two piles of steel sheets.

Plaintiff seeing Bauer at the fire and unable to gain his attention, "stepped on the board and started towards him." He walked down the board, felt his feet become insecure and the board started slipping, which caused him to be thrown forward. He said, "I tried to throw my balance so I could land on my feet." He failed in this effort and fell against a steel upright and was injured.

Herbert O. Stogsdill, produced as a witness for plaintiff, testified that on January 11, 1954, he was a crane operator for defendant. He said he was going to unload the truck by means of the crane he operated. Witness and Bauer were standing by the fire waiting for a Mr. Fleming to instruct them where to place the steel sheets that were on the truck. He thought he had been waiting for 10 or 15 minutes before the accident happened. While standing around the fire he saw plaintiff when he reached the top of the first pile of steel. He said plaintiff walked on the board towards him and it "slipped off the pile of steel" and plaintiff fell. He did not hear plaintiff call to Bauer. When asked about the board and its use he said, "It was a board we used for a ramp to get into a car—into the open car—we would use it as a ramp to walk up, and not have to climb a ladder into the car." The cars he referred to were railroad freight cars of the open coal car type. He said the cleated board would hook over the side of the freight car and then extend to a steel pile. They used this ramp to get in and out of the freight cars. However, witness admitted that he used it "to go up and down" the piles of steel sheets. He said that the cleated board was not fastened to the steel sheets in any way at either the top or the bottom.

Another witness produced by plaintiff was Cecil Fleming, an employee of defendant at the time of the accident. Fleming saw plaintiff when he was in the plant but did not see him fall. He said the area where the accident occurred was for the storage of steel. He was asked who was permitted in the area west of the truck and answered, "that was supposed to be for employees only." He further testified that the ramp used by plaintiff was cleated in order that it may be hooked, as he described it, over the side of open railroad cars, "something like a coal car" and the other end would be placed on a "pile." This ramp would then provide access to the open railroad cars in which defendant received shipments of steel. He further said that the ramp "wasn't made for use on piles (of steel) but possibly it was used for that." When asked if he had ever used the ramp to move from pile to pile, he said, "I may have," however, he could not be sure.

As we said at the beginning, defendant's motion for a directed verdict, offered at the close of plaintiff's evidence, was sustained.

■■ In considering the first point relied on by defendant we are mindful that it has the burden of showing that the trial court abused its discretion in granting plaintiff a new trial. Simpson v. Kansas City Connecting Railroad Company, Mo., 312 S.W.2d 113. In determining whether plaintiff's evidence was sufficient to make a submissible case for the jury, we must consider the evidence in a light favorable to plaintiff and give him the benefit of all favorable evidence and all favorable inferences therefrom. Thaller v. Skinner & Kennedy Co., Mo., 315 S.W.2d 124, loc. cit. 126.

Defendant admits that plaintiff was an invitee when he parked his tractor trailer truck at Bauer's direction in the driveway. However, it contends that the invitation to plaintiff to come on its premises did not extend to that portion of the premises on which the accident occurred. A consideration of this contention requires a definition of an invitation as it may apply to the facts and circumstances presented by the record before us.

■■ The word "invitation" as used in considering the legal duty of an owner or occupant of land to another who enters upon the property is not an invitation in a popular but in a legal sense, and includes an invitation implied by any state of facts upon which it naturally and reasonably arises. An implied invitation is "one which is held to be extended by reason of the owner or occupant doing something or permitting something to be done which fairly indicates to the person entering that his entry and use of the property are consistent with the intentions and purposes of the owner or occupant, and leads him to believe that the use is in accordance with the design for which the place is adapted and allowed to be used in mutuality of interest." 65 C.J.S. Negligence § 43(3), p. 510; Happy v. Walz, 358 Mo. 56, 213 S.W.2d 410, loc. cit. 414, 415; Meyer v. St. Louis Public Service Co., 241 Mo.App. 1057, 253 S.W.2d 525; Evans v. Sears Roebuck & Co., Mo.App., 104 S.W.2d 1035.

■ An invitation may be manifested by the arangement of the premises, Gilliland v. Bondurant, 332 Mo. 881, 59 S.W.2d 679; 65 C.J.S. Negligence § 43(3), p. 510, and, obviously, the contrary is true in that the premises may be so arranged as to preclude an invitation.

■ In the instant case we think plaintiff's invitation extended only to such portions of the premises necessary to be visited or used by him in the course of delivering the materials remaining on his truck, and for defendant to be liable to plaintiff as an invitee, his injuries had to occur at a portion of defendant's premises where the presence of plaintiff could be reasonably anticipated by defendant. Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S.W.2d 797.

■ We think the sole portion of the premises to which plaintiff was invited was the driveway into which he backed his truck and perhaps the inside of the plant in which he sought warmth. We do not believe that defendant's invitation to plaintiff, under the circumstances of this case, extended to an area which was shown by plaintiff's own evidence to be one for the storage of defendant's materials and one where only employees of defendant were supposed to be. We do not think reasonable men would differ in this belief.

■ It should be pointed out here that the burden is on the plaintiff to show that there was some act or conduct of the defendant which afforded a reasonable basis for plaintiff's belief that he was an invitee and could climb the first pile of steel and enter an area which was designed and arranged solely for the storage of defendant's materials. Gilliland v. Bondurant, supra; 65 C.J.S. Negligence § 43(3), p. 510.

Plaintiff testified that he would not unload the truck. He had nothing to do with the unloading of the truck. He knew the steel sheets on his truck would be removed by means of an overhead crane. He knew this was the only way the steel sheets could be removed. He knew the overhead crane would be operated by defendant's employees and would lift the steel sheets and deposit them in a storage spot assigned by said employees. He knew Bauer was going to get a crane crew so that the crane could be operated into position to remove the steel sheets. He was told this by Bauer. Moreover, he knew this had been the procedure on the occasions of previous deliveries made by him. He so testified. Plaintiff's sole function under the circumstances was to attend to his truck. He had moved it into the driveway as directed by Bauer and his sole remaining function was to drive it back to his employer's place of business after defendant's employees had unloaded the steel sheets and, as we have pointed out, with which he had no connection.

The sole purpose of his visit at the time in question was to back the truck in and operate it out of the driveway; that was the only purpose plaintiff had to serve in connection with the business dealings between him and defendant company. The invitation to back the truck into the driveway and then operate it out of the driveway after it was unloaded cannot be enlarged upon by plaintiff to include parts of the premises to which the invitation did not extend and which had nothing to do with the purpose of his visit. Plaintiff's evidence showed nothing that tended to reasonably indicate that plaintiff's use of the storage area was consistent with the intention and purposes of defendant and showed nothing from which it could be inferred that defendant could reasonably anticipate plaintiff's presence in the storage area.

■ It is a much invoked rule, cited in many cases of this state, some of which we cite below, that: "It is well settled that an invitation to a person to visit a particular portion of the premises or to the premises generally for a particular purpose 'does not give him the right to roam at will, with the further invitation, to out of the way places in the premises, wholly disconnected from, and in no way pertaining to the business in hand.'" Watson v. St. Joseph Coal Mining Co., 331 Mo. 475, 53 S.W.2d 895, loc. cit. 897. See also Menteer v. Scalzo Fruit Co., 240 Mo. 177, 144 S.W. 833; Gayer v. J. C. Penney Co., Mo. App., 326 S.W.2d 413; Shuck v. Security Realty Co., Mo.App., 201 S.W. 559; 65 C.J. S. Negligence § 48, pp. 535, 536.

■ Where plaintiff was an invitee as to certain portions of the premises and proceeds to enter other portions of the premises to which he is not authorized to go by the invitation, he loses his status as an invitee and becomes a mere licensee.

A case somewhat similar on the facts, decided by this court, is Gayer v. J. C. Pen-

ney Company, supra, wherein plaintiff, a minor, strayed from the sales area of a store into a stockroom. The minor plaintiff in that case entered the stockroom seeking to locate his mother to ask her for money with which he intended to make purchases in defendant's store. We said:

"In the instant case plaintiff was not confused or unaware that the area he entered was not one open to customers, * * * for he knew from past experience that it was the stock room * * * Furthermore, his only purpose in entering the stock room was a purely personal one, to locate his mother to ask her for more money. The mere fact that his ultimate purpose may have been, as plaintiff contends, to use the money to make a purchase in defendant's store did not authorize him to enter an area not open to the public, nor was he entitled to the status and duties owed an invitee when he entered therein." 326 S.W.2d loc. cit. 417, 418.

In the instant case the only reason given by plaintiff for entering the storage area was that he was looking for Bauer. In the aforesaid Gayer case the plaintiff was seeking to locate his mother in order to obtain more money to use in making purchases in defendant's store, and despite this purpose, we held that plaintiff was not an invitee when he entered the stock room of defendant.

Plaintiff contends that there is nothing positive in the record to indicate that truck drivers, such as plaintiff, were generally prohibited from going into the storage area and that there is nothing to indicate that plaintiff was told not to go there. If Bauer wanted plaintiff in the storage area he would have invited him. The fact Bauer did not invite him would reasonably indicate no invitation was extended. Furthermore, there was no evidence adduced by plaintiff to show that he knew and that defendant knew of a custom of truck drivers visiting this area.

Plaintiff in his testimony never did say why he looked for Bauer. In his brief plaintiff admits he needs the benefit of a reasonable factual inference, to be drawn from the evidence, to the legal effect that he was an invitee when he entered the area of his accident to look for Bauer. He says that because of the cold and the delay, it was reasonable for him to ascend the ladder and use the ramp in pursuit of Bauer. The answer to this contention is that the record fails to show that plaintiff looked for Bauer for the reasons given. The fact is that the evidence does not show there was delay. There was no evidence as to the time ordinarily required to round up a crane crew for unloading the steel sheets from plaintiff's truck. Plaintiff's own testimony shows that he entered the plant for the purpose of seeking warmth and it cannot be reasonably inferred that he was seeking the warmth of the fire in the barrel or canned stove around which Bauer and other of defendant's employees were standing. In this connection plaintiff's evidence does not show that he had knowledge of such a fire or was looking for the fire.

Giving plaintiff all favorable inferences from the evidence, we find nothing in his evidence from which a jury could reasonably infer that he was an invitee when he ascended the ladder, used the ramp, and entered the storage area of defendant's premises. There was nothing in the arrangement or design of this area which would show that plaintiff was either expressly or impliedly invited to enter it, and there was nothing in plaintiff's evidence to show that defendant could have reasonably anticipated his presence at the place and under the circumstances of his injury.

Defendant's duty towards a licensee was to refrain from wanton conduct or active negligence. Plaintiff makes no contention that defendant was guilty of either and we find nothing in the record that would tend to prove either wanton conduct or active negligence on the part of defendant.

In view of the result reached by us it is unnecessary to consider other points relied on by defendant.

Plaintiff urges the point that despite a finding that he did not make a case for the jury on the evidence actually received by the trial court that, nevertheless, he is entitled to a new trial because the trial court erred in refusing to permit him to adduce evidence to the effect that at the time of his injury he was directly enroute to a place on defendant's premises where it had a fire burning, and that it was customary for truck drivers, such as plaintiff, to go to such a fire in cold weather. Plaintiff sought to prove that a custom existed for truck drivers to resort to the fire, where Bauer was standing, to warm themselves. By showing such a custom plaintiff contended he had a right to go to the fire and was an invitee on the "ramp" enroute thereto.

This point was not presented to the trial court in plaintiff's motion for a new trial. Plaintiff acknowledges this but contends that the trial court's action constitutes a plain error affecting plaintiff's substantial rights, and to prevent a miscarriage of justice, this court should invoke Civil Rule 79.04, V.A.M.R., and affirm the order of the trial court granting a new trial.

In the course of presenting his evidence in the trial court plaintiff sought to show that it was the custom for other truck drivers to visit the fire where Bauer was standing. Plaintiff did not plead the existence of a custom and his reliance thereon. When plaintiff offered to show that other truck drivers visited the area of the fire, defendant's objection thereto was sustained by the trial court. Thereafter, plaintiff's counsel made a statement to the court in the nature of an offer of proof, whereby he offered to prove a custom of use of the area in "the general vicinity where Mr. Moss (plaintiff) fell, and that they (other truck drivers) did go over to this fire and used the fire to warm themselves * * * that if prior truck drivers did the same thing it was the custom" and, therefore, plaintiff had the right to go to this same area.

In order for plaintiff to have the benefit of the existence of a custom and practice it must be pleaded, and shown by the evidence, that plaintiff knew of its existence and relied on it. Emerson Electric Mfg. Co. v. Terminal R. Ass'n, Mo.App., 262 S.W.2d 323. No custom was pleaded, nor did plaintiff's statement to the court contain an offer to prove plaintiff's knowledge of such custom and his reliance thereon. In addition, and of more importance, plaintiff never did testify that he was seeking the warmth of the fire, nor did he say that he knew of the existence of the fire and the custom he sought to invoke. As we have pointed out, he sought warmth inside the plant. The trial court committed no error in the respects complained of and, therefore, plaintiff is not entitled to any relief under Civil Rule 79.04, V.A.M.R.

The trial court erred in sustaining plaintiff's motion for a new trial and in vacating the judgment entered pursuant to the court's order sustaining defendant's motion for a directed verdict offered at the close of plaintiff's evidence. The order sustaining plaintiff's motion for a new trial and vacating the judgment entered pursuant to its order sustaining defendant's motion for a directed verdict is reversed and the cause remanded with directions to reinstate the order sustaining defendant's motion for a directed verdict and to enter a judgment in favor of defendant.

ANDERSON, P. J., and WOLFE, J., concur.