CHESTER SMITH, by his next friend, J. C. PARKINS, Appellant, v. THE SOUTHWEST MISSOURI RAILROAD COMPANY and THE EMPIRE DISTRICT ELECTRIC COMPANY.—62 S. W. (2d) 761.

Division One, August 3, 1933.

*R. A. Pearson, Wilbur Owen* and *Frank H. Lee* for appellant.

316

*A. E. Spencer, Jr.,* and *A. E. Spencer* for The Empire District Electric Company; *McReynolds & Flanigan* for The Southwest Missouri Railroad Company.

ATWOOD, J.—This is an action for damages by Chester Smith, by his next friend, J. C. Parkins, against The Southwest Missouri Railroad Company and The Empire District Electric Company, on account of personal injuries alleged to have been sustained by plaintiff through the negligence of defendants. At the close of plaintiff's evidence defendants interposed separate demurrers thereto which were sustained. Plaintiff excepted to this action of the trial court and took a nonsuit as to each defendant with leave to move to set the same aside. Judgment was thereupon entered for defendants and in due time plaintiff filed motion to set aside the orders of nonsuit, which motion was denied and plaintiff has appealed.

Plaintiff alleged and his proof showed that during the month of September, 1926, and long prior thereto, defendant railroad company operated an electric railway through Galena, Kansas, wher' it owned and operated a substation for receiving and transforming electric current furnished thereto by defendant electric company. On the 12th day of that month plaintiff, then seventeen years of age, while in a passageway installed and regularly used in this substation, suffered an electric shock from an adjacent high tension wire and was distressingly burned and maimed for life. The station was a room some twenty feet square. A middle east and west wall divided it, with an open doorway in the middle between the two compart-' ments. Some large electric machines called converters were located in the south compartment on each side of the open way leading directly to the middle doorway. The station adjoined a dwelling house where appellant lived as a member of the family of his grandfather who was the operator in charge of the station. A door opened from the residence directly into the station at the southwest corner. The open way led from this door to the middle of the room, thence north between the converters, through the middle doorway of the partition and through a railed passageway in the north compartment. On each side of this passageway were machines and parallel wiring connecting them. Electric current came down from the roof at the northwest corner of the station, at which point it was delivered by defendant electric company, thence down to an oil switch or choke coil in the north room, thence through wiring paralleling the passageway to transformers and thereafter to converters and other installations in the south compartment, and thence out for defendant railroad company's use.

Defendants were charged with negligence in the maintenance and operation of said electrical appliances and wiring in cramped, crowded and narrow quarters where persons were likely to be and necessarily must pass; in such maintenance and operation without sufficient or serviceable guards or rails properly spaced; in conveying said electric current "through defectively joined and defectively insulated and inadequately guarded electric wires;" and in "failing

to check over and inspect the wiring and appliances and wiring installations over which they were conveying a deadly electric current in near proximity to where persons were passing, so as to discover defects therein." Defendant electric company filed separate answer consisting of a general denial and plea of contributory negligence and further alleging that "if plaintiff was in the room described in the petition and received any injuries there that plaintiff was in said building without the consent or knowledge of either defendant, and not in the performance of any duties and without any right or authority there to be." Defendant railroad company filed separate answer consisting of a general denial and additional plea that "if plaintiff sustained any injuries on the premises of this defendant he was a trespasser and was guilty of negligence directly contributing to such injuries." Plaintiff replied with general denials.

Further reviewing the evidence in the light most favorable to plaintiff, as we must in ruling the action of the trial court on these demurrers. it appears that the electric company built the service line up to the arm on the outside of the substation in 1918. This service line was and continued to be the property of the electric company and carried a voltage of approximately 33000. This current was transformed by the railroad company for its use through its transformer located between the entrance of the 33000 volt wire and a rotary converter which converted it from an alternating to a direct current. The railroad company installed, owned, controlled, managed and repaired all electrical machinery and equipment in the substation for handling the electricity so received from the electric company. The electric company furnished some electrical workers to help in the original installation but they were controlled and paid by the railroad company. The only thing that the electric company had to do with the substation was to keep its meter equipment in repair and read the meter twice a month, but the meter wires carried only about 110 volts, and the evidence shows that none of the equipment controlled by the electric company had anything to do with plaintiff's injuries.

About five o'clock in the afternoon of the day he was injured plaintiff entered the station with a companion about his own age and said to his grandfather, who was then in charge, "I am going to show this young fellow through the station." His grandfather replied: "All right, but be careful." Plaintiff and his companion walked down the narrow aisle and after looking through the south compartment they started into the north compartment. The passageway was a foot and one-half or two feet wide and on each side were iron guard rails of the same height, the lower rail being about two feet from the ground and the upper rail about two feet higher. The nearest oil switch wire was about a foot beyond the guard rail and probably not quite as high as a man's head. Plaintiff testified that

he casually raised his hand "not over four or five inches from the perpendicular" to point out some copper coils overhead but did not touch a thing and the electricity arcked from the nearest oil switch wire and burned him so severely that his right arm had to be amputated at the shoulder joint and the index finger of the other hand and two pieces of rib removed. There was evidence that the wire from which the current escaped showed a hole burned in old insulation where the wire had been joined. It further appeared that, with the knowledge and apparent consent of defendant railroad company's representatives, agents and employees, visitors were allowed in the substation from time to time and plaintiff was permitted to help his grandfather in running the station. Plaintiff said that he knew the wires were dangerous to touch and that he never touched any of them even on this occasion, but that he never knew that electricity would arc from these wires and he had never been warned of this danger, and that no danger warnings of any kind were posted in or about the station. The evidence was conflicting and unsatisfactory as to the distance an electric current would arc under the circumstances shown, ranging from about one to twelve or fifteen inches, but there was testimony that the safety zone for persons moving about such wires was generally regarded as two feet.

■ Persons dealing with electricity must exercise the highest degree of care to keep their wires in such condition as to prevent injury to others who lawfully may be in close proximity thereto. [Foster v. Ry. Co., 26 S. W. (2d) 770, 773, 325 Mo. 18; Godfrey v. K. C. L. & P. Co., 253 S. W. 233, 299 Mo. 472; Williams v. Springfield Gas & Electric Co., 202 S. W. 1, 2, 274 Mo. 1.] There may be liability even for artificial conditions highly dangerous to constant trespassers upon a limited area. [Restatement, Torts (Tent. Draft No. 4), sec. 205; Clark v. Longview Public Service Company, 143 Wash. 319, 255 Pac. 380.] But this case was not presented on the "attractive nuisance" theory, or on the assumption that plaintiff was a trespasser. ■ It was tried on the theory that plaintiff was lawfully at the place of injury by permission of defendant railroad company's sole agent and representative then in charge of the station, who with the company's knowledge and consent followed the custom of allowing visitors in this part of the station and using plaintiff as an unpaid helper in the performance of his duties in and about the station. There was substantial evidence supporting this view and tending to show that plaintiff was at least defendant railroad company's gratuitous licensee. [45 C. J. p. 822, n. 35; Buck v. Ry. Co., 108 Mo. 179, 185; 18 S. W. 1090; Houston & T. C. Railroad Co. v. Bulger (Tex.), 80 S. W. 557, 560.] In Restatement, Torts (Tent. Draft No. 4), section 200, a licensee is defined as "a person who is privileged to enter land by virtue of the possessor's consent, whether given by invitation or permission." Section 201

of the same authority defines a gratuitous licensee as "any licensee other than a business visitor." The special liability of possessors of land to gratuitous licensees is thus stated in Restatement, Torts (Tent. Draft No. 4), section 212:

"A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he (a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and (b) invites or permits them to enter or remain upon the land, without exercising reasonable care (1) to make the condition reasonably safe, or (2) to warn them of the condition and the risk involved therein."

■ There was evidence that the wire at the point from which the current passed to plaintiff had been joined, that the insulation at that point was old and defective (Geismann v. Missouri-Edison Electric Company, 173 Mo. 654; 678, 73 S. W. 654), that the current would arc to a person in close proximity thereto, and that defendant railroad company knew or in the exercise of reasonable care would have known of these conditions and realized that they involved an unreasonable risk to plaintiff. While plaintiff was warned to be careful there was evidence from which the jury might conclude that he did not know the conditions and appreciate the risk involved, and that this defendant had reason to believe that such would not be discovered by him. We think it was for the jury to say whether this defendant exercised reasonable care to make the conditions reasonably safe or to warn plaintiff of the conditions and the risk involved.

■ As to defendant electric company we think the demurrer to plaintiff's evidence was properly sustained. The applicable rule supported by the weight of authority is thus stated in 20 Corpus Juris, page 364, section 49: "The duty and responsibility of a mere generating company is limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser's wires and appliances are in a safe condition and kept so." However, as said on page 365 of the same authority, "knowledge of the defective and dangerous condition of a customer's appliance will charge even a mere guarantor and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances." Among the authorities supporting the doctrine thus stated are Kuhlman v. Water, Light & Transit Co., 271 S. W. 788, 796, 307 Mo. 607; Hoffman v. Power Co., 91 Kan. 450, 461; Martin v. Appalachian Electric Power Co. (W. Va.), 153 S. E. 245; Minnesota Electric Light & Power Co. v. Hoover, 102 Okla. 270. There was no evidence that the electric company had any interest in or control over the substation or its contents

except the metering equipment, which plaintiff's witnesses conceded had nothing to do with his injury. This defendant was under no obligation to supervise or inspect defendant railroad's station, and there is no evidence that it had any knowledge of any defective machinery or wiring therein or negligent handling thereof.

It follows that the judgment should be reversed as to The Southwest Missouri Railroad Company and affirmed as to The Empire District Electric Company, and the cause remanded. It is so ordered. All concur.