EFFIE TWINE, RESPONDENT, v. NORRIS GRAIN COMPANY, APPELLANT.—
226 S. W. 2d 415.

Kansas City Court of Appeals. Opinion delivered January 9, 1950.

*Watson, Ess, Whittaker, Marshall & Enggas* and *Douglas Stripp* for appellant.

*David Trusty, Eugene R. Brouse, Sam Mandell, Popham, Thompson, Popham, Mandell & Trusty* for respondent.

10

BOUR, C.—This is an appeal by defendant from a judgment for damages in the sum of $7,500 for medical expenses incurred by plaintiff, and for loss of her son's services on account of injuries sustained by him when he came in contact with certain electric equipment in a substation on the premises of a grain elevator located in North Kansas City, Missouri. The grain elevator in question is owned by the Chicago, Burlington & Quincy Railroad Company, and the defendant herein, Norris Grain Company, was the lessee and operator of the elevator at the time of the accident.

The petition alleged that for many years pigeons in great numbers had gathered in and about the electric substation on defendant's premises; that for many years boys and men had been in the habit of going on the premises to catch pigeons, with the knowledge of defendant which had made known to such boys and men that the pigeons were a nuisance and that it desired to be rid of them; that defendant made known to plaintiff's son and others that they had permission and approval and the invitation of defendant to catch pigeons on the premises; that on July 17, 1943, her son went on the premises for such purpose, with the consent and approval and by invitation of defendant, and climbed a stairway leading to a platform adjacent to the substation; that he was unaware of the dangerous nature of the equipment in the substation and was not given reasonable warning by defendant of such condition; that in attempting to catch a pigeon he stood upon the railing of the stairway and reached across a fence between himself and such electric equipment and touched or came into such close proximity to such equipment that he received a high voltage electric shock and was injured; that defendant knew or by the exercise of due care

should have known that boys would be likely to come on the premises to catch pigeons and to go up the stairway, climb onto the railing, and come in close proximity to dangerous electric currents and be injured or killed; that defendant with such knowledge negligently consented to and approved the practice of large numbers of boys coming on the premises to hunt pigeons; that defendant so negligently constructed and maintained the substation as to constitute a dangerous trap and condition for young persons on the premises who were unfamiliar with the nature of the equipment thereon; that defendant negligently failed to give reasonable warning of this condition and failed to make said condition safe for persons using the premises as aforesaid; that defendant knew or by ordinary care could have known that persons so using the premises would not discover such condition or realize the risk thereof; that defendant negligently failed to maintain any locked door or gate at the entrance to the passageway leading ·to the substation and failed to maintain fences, screens or walls so as to prevent entrance by persons to such equipment and contact therewith; that there were metal plates on the substation fence which were grounded and which made an extremely dangerous condition for a person who reached across them and came into contact with the electric equipment; that defendant negligently failed to provide guards constructed of non-conducting materials which were not grounded; that defendant negligently failed to construct the substation in compliance with certain regulations of the National Electrical Safety Code; and that there was a general practice in the business to comply with said Code.

Defendant's answer denied all allegations of the petition except the fact of its incorporation and operation of the grain elevator, and pleaded contributory negligence on the part of plaintiff's son.

The substation in question was located in an area between three separate buildings on the premises of defendant, namely, the head house or·main elevator building on the north, the drier house on the east, and the engine house on the south. The three open spaces between these buildings were closed off by three small mesh, woven wire fences. Thus the substation was entirely enclosed by the three buildings and the three woven wire fences. One such fence (where plaintiff's son was injured and hereinafter called "the north fence") was on the north side of this area and ran east and west between the west side of the drier house and the east side of the southerly projection of the head house. There was no gate in the north fence. The only entry to the enclosure was through a gate in the wire fence across the west end of the area, which gate was kept locked because the substation was self-functioning and the presence of defendant's employees in the enclosure was not required. Whenever the equipment needed attention it was taken care of by the

Power & Light Company or the Burlington Railroad. Power lines carrying 13,200 volts entered the substation from a pole located east of the drier house. A passageway about five feet wide and twenty-seven feet long extended from east to west between the head house on the north and the drier house on the south. The only entrance to the passageway was on the east and there was no gate or door at the entrance. This passageway was L-shaped because it turned left or to the south behind the drier house, at its west end. The far end of this passageway was closed off by the north fence which, with the adjoining buildings, formed a part of the enclosure of the substation, as explained above. At the end of the passageway, and outside the fence, a stairway led up to a platform alongside the east end of the fence and next to the drier house, giving access to a door in the drier house. The wire fence was 15½ feet high. That portion of the fence back of and above the platform, and extending two or three feet to the west of it, was composed of two solid metal plates 7 feet, 8½ inches in height, instead of the wire fencing used elsewhere, in order to prevent long, narrow objects, such as tools or pipes, being thrust through and into contact with the electric equipment on the other side of the fence. The platform was 7 feet, 10 inches above the ground. The railing which guarded the west side of the platform was 31 inches above the platform, and the distance from the top of the railing to the top of the metal plates, which formed a part of the fence, was 5 feet or 5 feet, 1½ inches.

Plaintiff's son, James Twine (hereinafter called Twine), was injured on July 17, 1943, while attempting to catch pigeons on the premises of the grain elevator. Twine, who was then just over sixteen years of age, was employed with other boys by the Burlington Railroad on a section gang which had been working around the grain elevator for two or three days before his injury, cutting weeds and grass. The accident occurred sometime after three p. m., while Twine was on his way home after he had finished his work day and had checked out at the section gang's shanty some distance south and west of the elevator. When Twine and two other members of the gang (Nooner and Cruce) neared the elevator one of them suggested that they attempt to catch some pigeons, and in so doing they went down the passageway described above. Twine saw some pigeons fly up over the fence at the far end of the passageway, and he went up the stairway mentioned above, climbed onto the railing guarding the outside of the platform, and in an effort to scare up a pigeon he reached over the metal plates which formed a part of the fence at that point and with his left hand tapped the over of a lightning arrester inside the substation while his right hand rested on the metal plates which were grounded. As a result, Twine received a severe electric shock and burns which made

it necessary to amputate his left arm two inches below the elbow. Twine testified that the top of the metal plates on the fence, as he stood on the railing, reached about up to his chin; that he could see what was on the other side but had to reach over the top of the fence in order to tap the cover of the lightning arrester.

With regard to the pigeons, all of the witnesses who had been around the grain elevator testified that they had seen many pigeons there. Plaintiff's evidence was that at the time Twine was injured, and for several years before that date, pigeons in large numbers gathered on defendant's premises. Several witnesses testified that they saw pigeons inside the substation, on the north fence of the substation, and in the passageway leading to the north fence.

Four teen-age witnesses who lived about a mile south of the elevator testified as plaintiff's witnesses that they had hunted pigeons on defendant's premises prior to the accident when they were around eight to thirteen years of age. All but one of them had stopped the practice prior to the time Twine worked near the elevator. One said he had been there "a great many times"; another said he had hunted pigeons there "two or three dozen times." Two of these witnesses said that Lakey, the defendant's foreman, gave them permission to hunt pigeons and that he said the pigeons were a nuisance. The same witnesses testified they had seen many other boys hunting pigeons on the premises; that it was usual for boys to drive the pigeons down the passageway, which formed a trap for them at the far end, so that they could be caught with the hands. Sometimes the boys would stand on the railing on the platform and reach up and take pigeons off the top of the metal plates. The testimony of a former employee of defendant was to the same effect. This witness also said that on numerous occasions prior to Twine's injury he saw Lakey standing near the entrance to the passageway when boys were going in and out of the passageway. Plaintiff's evidence also showed that Lakey gave orders to men working around the elevator and that these men obeyed such orders. Twine and Nooner, who had been working around the elevator three or four days before the accident, testified that during that period they saw other boys enter the passageway and come out with pigeons. Twine admitted on cross-examination that he was not acquainted with and had not talked to any of the boys mentioned above, except Nooner; that he had never been near the elevator and did not know what people did there until he went to work on the section gang; and that he had never seen anyone climb up on the platform to catch pigeons.

Twine and Nooner also testified that sometime before noon on the day of the accident they heard some other member of the section gang ask a man whether it was all right to go inside and catch pigeons, and the man answered in the affirmative and re-

14

marked that the pigeons were a nuisance. The boys were working close together at the time. Nooner "believed" this man was the elevator foreman. Twine thought he was the man he had seen in the courtroom the day before and who had been identified as Lakey, the elevator foreman. Twine admitted on cross-examination that at the time he did not know who the man was, nor by whom he was employed; that he did not ask anyone if he could catch pigeons; and that he was not "invited" to catch pigeons. Lakey, who was called as a witness for plaintiff, denied that he had ever given anyone permission to hunt pigeons and testified that for many years the company had a rule prohibiting such a practice, even by employees; that since long before the accident the defendant had made every effort to enforce the rule and to prohibit trespassing, and that he had no authority to waive the rule. Lakey also testified on cross-examination that the pigeons did not interfere with the operation of the elevator, and denied that any effort was made to get rid of them.

Several boys and a former employee of defendant testified as plaintiff's witnesses that on numerous occasions before the accident they had been in the passageway and around the north fence where Twine was injured, and that they never saw a warning or danger sign on that fence or in the passageway; but two of these witnesses said there were one or two "No Trespassing" signs on other parts of the premises. Twine and the boys (Nooner and Cruce) who were with him at the time of the accident denied that a warning sign was on the north fence when Twine was injured. Cruce was not certain of this and admitted that there was a "No Trespassing" sign on a brick building which was not clearly identified. Several employees of defendant testified as witnesses for defendant that a "Danger—High Voltage" sign had been on the north fence for many years, and that there were "No Trespassing" or "Keep Out" signs about the premises. An employee of the Power & Light Company who answered a trouble call following the accident, and a photographer sent by that company, testified that they arrived at the elevator within an hour or two after the accident, and that when they arrived a "Danger—High Voltage" sign was on the north fence, and that it was legible.

Twine testified that when he was in the passageway he saw the equipment on the other side of the wire fence but did not know that it was electric equipment. On cross-examination, he said that he had studied and passed a general science course in high school but denied having studied the two chapters in the text which dealt with electricity.

Defendant's first point is as follows: "The court erred in refusing defendant's motion for a directed verdict at the close of all the evidence because James Twine was not an invitee on its premises.

and it owed him no duty to make them safe or to warn him against any danger therein." Defendant's first position is: "A. Permission to hunt pigeons on the premises was not given by anyone having authority to do so." Hence, Twine was a trespasser to whom defendant owed no duty with respect to the negligence charged. Defendant's second position is: "B. The hunting of pigeons was of no real benefit or interest to defendant and permission to do so would make Twine only a bare licensee at best." Consequently, the defendant owed Twine no duty to make the premises safe or to warn him of any existing danger thereon. As to defendant's point I-B, both parties briefed at length the question of whether defendant's foreman, Lakey, had express or apparent authority to give such permission and, if he had apparent authority, whether Twine relied upon such authority; and other points relating to the question of whether Twine went on the premises to catch pigeons with the express or implied consent of defendant. However, the conclusions which we have reached in this case make it unnecessary to consider defendant's point I-B. Viewing the evidence in the light most favorable to plaintiff, as we must, we have concluded that plaintiff did not make out a case for the jury, even if Twine entered the premises with the express or implied consent of defendant, because he was not on the premises at the time in question for any purpose of real benefit or interest to defendant; and because his injury was not the result of any active or affirmative negligence on the part of defendant. It should be noticed in passing that plaintiff's case is not based on the attractive nuisance doctrine. Cf. Hull v. Gillioz, 344 Mo. 1227, 130 S. W. (2d) 623.

The Missouri decisions classify persons who enter land in the possession of another as trespassers, licensees, and invitees. A trespasser, of course, is one who comes on the premises without the consent of the possessor and without a privilege to do so created by law. See the following cases where the duty of a land occupier towards a trespasser is discussed. Kelly v. Benas, 217 Mo. 1, 9, 116 S. W. 557, 559; Berry v. St. Louis, M. & S.E. R.R. Co., 214 Mo. 593, 604, 114 S.W. 27; Everett v. St. Louis & S.F. R.R. Co., 214 Mo. 54, 112 S. W. 486. A licensee (often called "a bare licensee") is one who enters the premises for his own purpose and with the express or implied consent of the possessor. The possessor is under no duty to such a person to make the premises safe or to warn of dangerous conditions thereon, the possessor being liable only for "wanton or willful" acts or "active negligence." Glaser v. Rothschild, en Banc, 221 Mo. 180, 184, 120 S. W. 1, 2. An invitee (sometimes called a "business guest") is one who enters the premises with the express or implied consent of the possessor and for some purpose of real benefit or interest to the possessor or

for the mutual benefit of both. The duties which a possessor owes to such a person include the obligation to make the premises safe or to warn of dangerous conditions thereon, as well as the duties which are owed to a licensee. Giles v. Moundridge Milling Co., 351 Mo. 568, 573, 173 S.W. (2d) 745, 748; Cash v. Sonken-Galamba Co., 322 Mo. 349, 453, 17 S. W. (2d) 927, 929.

The above mentioned distinction between a licensee and an invitee is recognized in a long line of Missouri decisions. The leading case on the subject is Glaser v. Rothschild, supra, decided in 1909 by the court en Banc. In Stevenson v. Kansas City Southern Ry. Co., 348 Mo. 1216, 159 S. W. (2d) 260 (Division 1, 1942), the plaintiff was injured by the collapse of a building. It was held that the plaintiff was a licensee and not an invitee because he went on the premises for his own purposes and, therefore, that he was not entitled to recover, regardless of whether the building collapsed on account of defective plans prepared by the defendant owner. The opinion contains the following passage (159 S. W. (2d) l. c. 262), which includes quotations from the Glaser case, supra: ''The rule in this state is that 'the owner or occupier of premises lies under no duty to protect those from injury who go upon the premises as volunteers, or merely with his express or tacit permission, from motives of curiosity or private convenience, in no way connected with business or other relations with the owner or occupier'; but that 'a bare licensee (barring wantonness, or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as he finds them.' However, this is not the rule 'when the owner invites the use of his premises for purposes connected with his benefit, pleasure and convenience.' In that situation, our rule is 'that a licensee, who goes upon the premises of another by that other's invitation, and for that other's purpose, is no longer a bare licensee,' but 'becomes an invitee, and the duty to take ordinary care to prevent his injury is at once raised, and for the breach of that duty an action lies.' (Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1.) We have also said that 'the status of an invitee will not be accorded by permission to enter on or use the property, in the absence of any *real benefit* to the owner.' (Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679, l. c. 688; see, also, Savage v. C.R.I.&P.R. Co., 328 Mo. 44, 40 S. W. (2d) 628; Liability of a Possessor of Land in Missouri to Person Injured While on the Land, McCleary, 1 Mo. Law Rev. 45, l. c. 59.) Thus, the real test of the status of invitee (to whom the owner has the duty to take ordinary care to prevent his injury) is the purpose of his visit. See 20 R.C.L. 69, sec. 60; 45 C.J. 812, sec. 221. One cannot be declared the invitee of the person sought to be held liable, for failure to exercise due care to prevent his injury, unless he was there for some purpose of *real benefit* or *interest* to such person.'' (Italics ours.) The court then referred

to sec. 331 of the Restatement of the Law of Torts which says that the term "gratuitous licensee" as used in the Restatement includes persons "whose presence on the land is solely for the licensee's own purposes, in which the possessor has no interest," and to sec. 342 of the Restatement which makes a possessor of land liable for harm "caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he (a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and (b) invites or permits them to remain upon the land, without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to warn them of the condition and the risk involved therein." The court continued (159 S. W. (2d) l. c. 263): "There is nothing in the evidence herein to show that defendant had actual knowledge or realization of any unsafe condition of the building."

Plaintiff seems to contend that our Supreme Court has adopted sec. 342 of the Restatement as the law of Missouri, and that the rule stated there should be applied in the instant case. The Stevenson case does not support this view, for the court said (159 S. W. (2d) 263): "Even this rule (sec. 342), as to known conditions, goes beyond the Missouri rule that such a licensee 'takes the premises as he finds them,'" citing the Missouri Annotations to sec. 342, which reads: "The law of Missouri is not in accord (with sec. 342) * * *." No doubt the court's reference to sec. 342 was for the purpose of comparing that rule with the Missouri law, and also for the purpose of demonstrating that even under the broader rule of the Restatement the plaintiff in that case was not entitled to recover.

In Porchey v. Kelling, 353 Mo. 1034, 185 S. W. (2d) 820 (Division 2, 1945), the defendant operated a filling station on a corner location, and it had long been the habit of pedestrians to take a short cut across the premises. Plaintiff took a short cut across the station at night and fell into an open grease pit. Since the plaintiff was not an invitee but was on the premises solely for his own benefit (i.e., a licensee), and since he was not injured by any "active or affirmative negligence" on the part of defendant, it was held, in accordance with the Glaser and Stevenson cases, supra, that the plaintiff was not entitled to recover. After quoting at length from the last mentioned cases, the court said (185 S. W. (2d) l. c. 823): "The Missouri cases may not accord with all statements in the Restatement of Torts on this subject; but our search indicates they harmonize with the majority of the jurisdictions." We believe that our Supreme Court has made it clear in the Stevenson and Porchey cases that the law of Missouri is not in accord with said sec. 342 of the Restatement. We also believe that the instant case is governed by the rules and principles

set forth in the Glaser case and reiterated in the Stevenson and Porchey cases.

Assuming, then, that Twine went on the premises to catch pigeons with the express or implied consent of defendant, the decisive question in this case, according to the authorities cited above, is whether he was there for his own purpose or for some purpose of real benefit or interest to defendant.

The evidence showed that for many years pigeons in large numbers gathered on defendant's premises. One of plaintiff's witnesses said they were "all over the place." The grain around the elevator made a natural feeding place for them and there was a water fountain outside the office window where they could drink. There were several other grain elevators in the vicinity. Under such circumstances, it would be extremely difficult, if not impossible, to prevent the pigeons from gathering on defendant's premises. It is obvious that comparatively few could be caught by hand, so that the intermittent hunting of pigeons would not noticeably reduce their number. There was evidence that defendant's superintendent shot at pigeons on two occasions, and that, as previously stated, when defendant's foreman told the boys they could catch pigeons on the premises he remarked that the pigeons were a nuisance. But there was no substantial evidence that defendant made any serious effort to get rid of the pigeons, and no evidence whatever that they interfered with the operation of the plant or caused any measurable loss of grain. We agree with the statement in defendant's brief that the foreman's remark was a mere casual comment "in about the same category as a farmer's hired hand giving permission to a passer-by to pick dandelions or some other plentiful wild flowers * * * and remarking that they were just a nuisance." The evidence most favorable to plaintiff does not show that at the time of the unfortunate accident Twine was on defendant's premises for any purpose of "real benefit or interest" to defendant. It follows that Twine's status was that of a licensee to whom defendant owed no duty to make the premises safe or to warn of dangerous conditions thereon. This leads to the conclusion that plaintiff did not make out a submissible case unless the evidence showed, as plaintiff contends, that her son's injury was caused by "active or affirmative negligence" on the part of defendant.

Plaintiff refers to the substation as a dangerous artificial condition, and contends that defendant was under a duty to make the condition safe for Twine or to warn him of such condition. Plaintiff's petition and Instructions 1 and 2, given at the request of plaintiff, are evidently based on this theory. Nevertheless, plaintiff also contends that the operation of a highly charged substation without proper safeguards or sufficient warning was "active or affirmative negligence" on the part of defendant. In this con-

nection plaintiff claims that the cases cited above, such as the Stevenson case (where a building collapsed) and the Porchey case (where plaintiff fell into an open pit), are not controlling here because they involve injuries caused by the condition of the premises, whereas Twine's injury was caused by active or affirmative negligence. It is true, of course, that a land occupier is subject to liability for bodily harm caused to a licensee by the active or affirmative negligence of the occupier. Most of the cases applying this principle are railroad cases where the train crew negligently failed to avoid injuring a trespasser or licensee whose presence on the track was known or should have been anticipated. A typical case is Ahnefeld v. Wabash Railroad Co., 212 Mo. 280, 111 S. W. 95. It is obvious that the plaintiff herein neither pleaded nor proved any facts showing that Twine's injury resulted from defendant's "active or affirmative negligence," as that term is used by the Missouri courts in connection with the subject under discussion. The fixed, self-functioning substation was as much a condition of the premises as the open pit in the Porchey case. The character of defendant's alleged negligence was no different from that of the defendants in the Stevenson and Porchey cases. Plaintiff's argument to the contrary is without merit.

Since the evidence does not show that plaintiff was on the premises in question for any purpose of real benefit or interest to defendant or that his injury was caused by active or affirmative negligence on the part of defendant, it follows that plaintiff did not make out a case for the jury.

Plaintiff relies upon the case of Smith v. Southwest Mo. R. R. Co., 333 Mo. 314, 62 S. W. (2d) 761, decided by Division 1 in 1933, where the defendant operated an electric substation which adjoined a dwelling house where plaintiff lived with his grandfather who was the operator in charge of the station. On the day he was injured the plaintiff, then seventeen years of age, entered the station with another boy and said to his grandfather: "I am going to show this young fellow through the station." His grandfather replied: "All right, but be careful." As the plaintiff and the other boy were walking down a passageway between the equipment, plaintiff raised his hand to point out some coils, and the electricity arced from a wire where the insulation was defective and plaintiff was severely burned. The trial court sustained a demurrer to the evidence and this ruling was reversed on appeal. The court said (62 S. W. (2d) l. c. 763): "It was tried on the theory that plaintiff was lawfully at the place of injury by permission of defendant railroad company's sole agent and representative then in charge of the station, who with the company's knowledge and consent followed the custom of allowing visitors in this part of the station and using plaintiff as an unpaid helper in the performance of his duties in and about the station.

There was substantial evidence supporting this view and tending to show that plaintiff was at least defendant railroad company's gratuitous licensee." The court then referred to sec. 200 (now sec. 331) of the Restatement, Torts, which defines a gratuitous licensee as "any licensee other than a business visitor," and quoted sec. 212 (now sec. 342) of the Restatement, which, as we have stated in discussing the Stevenson case, imposes on a land occupier, who has knowledge of dangerous conditions on his land, a duty to make the premises safe for gratuitous licensees or to warn them of such conditions. If there was substantial evidence that defendant's agent, with the defendant's knowledge and consent, was using plaintiff as an unpaid helper, perhaps the decision can be reconciled with the Missouri cases cited above on the ground that plaintiff was in the substation for a purpose of real benefit or interest to defendant. However, the opinion as a whole indicates that the court did not place the decision on that ground but reached its decision by applying the principle stated in said sec. 342. To this extent, at least, the Smith case is not in harmony with a long line of Missouri cases, including the Stevenson and Porchey cases. It should be noticed that Glaser v. Rothchild, supra, was decided by the court en Banc in 1909; the Smith case by Division 1 in 1933; the Stevenson case by Division 1 in 1942; and the Porchey case by Division 2 in 1945. Since sec. 342 is intended to govern cases involving dangerous artificial conditions, and since our Supreme Court has made it clear in recent cases that the law of this state is not in accord with the Restatement, without indicating that the Missouri rule is subject to any exceptions, we do not believe that the Smith case is controlling in the case at bar.

Plaintiff also relies upon the case of Schneiter v. City of Chillicothe, 232 Mo. App. 338, 107 S. W. (2d) 112, decided by this court. This was an action against a city for injuries received by a boy about nine years of age when his kite string contacted electric wires maintained by the city over a street intersection. The court applied the familiar rule that corporations and municipalities which maintain electric wires in a street or other public place at a point where they have reason to anticipate that children will come in contact with them are under a duty to see that such wires are properly insulated and maintained, so as to afford protection to children who may come in contact with them. In the instant case we are not concerned with such a duty, but with the duty which an occupier of land owes to a person who enters the premises for his own purposes and with the express or implied consent of the occupier. Hence the Schneiter case is not in point.

For the reasons stated, we hold that the trial court erred in refusing to direct a verdict for defendant at the close of all the evidence.

Other assignments of error need not be considered. The judgment should be reversed. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is reversed. All concur.