Mary Elizabeth CARR, Plaintiff-Respondent,

v.

John BROOKS and Gladys Brooks,
Defendants-Appellants.

Earl CARR, Plaintiff-Respondent,

v.

John BROOKS and Gladys Brooks,
Defendants-Appellants.

Nos. 8080, 8081.

Springfield Court of Appeals.
Missouri.

April 12, 1962.

Webster & Dunn, Carthage, Richart, Titus & Martin, Joplin, for appellant.

Roy Coyne, Emerson Foulke, Joplin, for respondent.

McDOWELL, Judge.

Mary Elizabeth Carr and husband, Earl Carr, filed separate actions for damages against defendants for injuries sustained by Mrs. Carr in a fall at defendants' home. The actions were consolidated for trial, tried by the court, and judgments rendered in favor of plaintiffs. Defendants appealed.

In their separate petitions plaintiffs allege that they were invitees of defendants at their home on August 2, 1958, and about 10:15 P.M., as Mrs. Carr was descending the steps at the rear of defendants' home, which steps they aver were unlighted, she stepped on an old shoe laying at the front of the last step causing her to trip, fall, and be injured. Plaintiffs averred that defendants were negligent by failing to exercise "ordinary care" to furnish a reasonably safe place to walk and a reasonably safe exit from the step, and by either placing the shoe in front of the step or by

permitting it to be there such a length of time that defendants knew or in the exercise of "ordinary care" would have known of the likelihood of someone stepping on it and being injured and failure to warn. Plaintiff, Mary Elizabeth Carr, sued for her injuries, pain and suffering. Her husband, Earl Carr, in his derivative claim, sued for medical expenses incurred by his wife, loss of services and consortium.

On October 12, 1961, the court rendered judgment for plaintiff, Earl Carr, in the sum of $871.05, and for plaintiff, Mary Elizabeth Carr, in the sum of $6500.00.

The evidence, briefly stated, is: Defendants, husband and wife, maintain their rural home in Jasper County similar to the home in which plaintiffs live. Defendants' exhibit (D) is a photograph of their home and shows the concrete steps leading into the rear thereof, the place where Mrs. Carr fell and sustained her injuries. We make this exhibit a part of the statement of facts.

The front of the house faces the east. The rear of the house, the back porch at the west end thereof and the entrance to such back porch is by way of a screen door at the southwest corner. Also, at the southwest corner, on the south side of the house, are two concrete steps and a concrete stoop (making three steps in all) which lead to the back porch. The steps and stoop extend lengthwise east and west (6 feet and a little over 10 inches). About one-third of the stoop and steps are offset beyond the rear of the house so that much of the stoop is west of the west end of the house. The yard is southwest from the house. 34 feet south of the base of the concrete stoop and steps was located a pole which had attached thereto an electric light with a 200 watt bulb and light reflector 20 feet above the ground, which light was burning at the time of the

accident. There was a smokehouse located directly to the west of the home with a cellar door, although separated from the residence is in close proximity to the steps and stoop leading to the back porch.

One of the principal characters involved in these cases is a six or eight month old pup. Before the accident he got to "carrying the clothes off the clothesline". To stop this habit defendants had given him a man's old brown shoe to play with in the yard.

On the date of the accident, August 2, 1958, defendants were entertaining in their home with a supper. The affair included unshucked corn on the cob, encased in mud and cooked in the embers of an ashen fire in the back yard. Plaintiffs were invited as social guests to this supper, along with Mr. and Mrs. Hunter, defendants' son, his wife and child. The testimony is that Mrs. Brooks prepared a nice supper. There was no business involved, purely a social event.

Plaintiffs' testimony is: That they arrived at defendants' home about 6:00 or 6:15 P.M. Mr. Hunter and defendant, John Brooks were in the back yard roasting corn. Plaintiffs went around the south side of the house to the place where the corn was being roasted and prepared for the supper. After the corn was cleaned the ears were put on a platter and Mrs. Carr carried the platter into defendants' home via of the back or kitchen entrance. At this time it was still daylight. She went up the steps from the back yard. She testified that she entered "more to the west" side of the steps but could see the yard and steps very clearly. After partaking of the supper defendants and their guests left the house by the back door and carried their chairs into the south yard where they sat around and visited. The evidence is that it took about a half hour to finish supper and when the party moved to the back yard to visit it was "not so much" still daylight.

Some time after defendants' son and daughter left, the remaining women folk, defendant Mrs. John Brooks, Mrs. Carr and Mrs. Hunter, carried their chairs into the house via of the back steps to watch television. They stayed in the house about a half hour. Mr. Hunter, defendant John Brooks and Mr. Carr remained in the yard. It was Mrs. Carr's testimony that in coming down the back steps after supper and in going up the steps to re-enter the home she used "more to the west end" of the steps than "to the east".

Around 10:15 P.M. plaintiff, Earl Carr, entered the house and told his wife it was time to go home. Thereupon Mr. Carr and his wife left the house via of the back door, followed by Mrs. Hunter and Mrs. Brooks. Mr. Hunter and Mr. Brooks were still in the back yard. Mrs. Carr testified that in descending the back steps she went down "the east side because there was another lady there and I think Mrs. Brooks was right there, too". She gave this testimony:

"Q. When you first started down, when you took the first step down could you see it all right? A. Well, yes, I could see the step enough for that.

"Q. And then when you stepped down the second time, could you see the step all right? A. About that time, Earl said that, when I was just starting down.

"Q. And Earl (Carr) said, 'Look out for the dog'? A. Yes.

"Q. Where was the dog? A. He was lying at the bottom, right there."

Mrs. Carr testified that the dog was lying down by the bottom of the steps, about the middle thereof; that when Mr. Carr said "Look out for the dog", she saw the dog. She said she didn't have any trouble seeing him. She stated:

"Q. All right. Then you took how many more steps down? A. Well, the next step I took down was when I hit the ground there."

Her testimony was that the shoe was right up against the steps; that when she stepped down she saw it. She stated "When I stepped down, why I seen it, I

seen the shoe and about that time, it flipped me, my foot turned like that. * * * Well, it wasn't real plain, it wasn't real plain what I mean I knew it was a shoe, but I couldn't say what, it was a white shoe or a black shoe."

Her testimony was that when her husband drew her attention to the dog she was looking at the dog when she made the last step. She gave this testimony:

"Q. Had you ever seen that shoe before you stepped on it? A. No, sir.

"Q. You have no idea how it got there? A. No, sir."

Plaintiff Carr testified that when he went into defendants' home via of the back door before supper he noticed the dog and shoe on the ground near the bottom step, over toward the east end; that he said nothing to his wife or anyone about seeing the dog or shoe; that when he and his wife started to leave about 10:00 or 10:15 P.M., they went via of the back door and back steps; that when he came out he saw the dog at the foot of the steps with a shoe; that he stopped about the second step from the bottom and said "Mom, be careful. Don't step on the dog." He said the dog was right in front of his wife where she was coming down, lying parallel with the steps, his head to the east and the shoe east of his head; that his wife was looking at the dog when she stepped on the shoe and fell; that Mr. and Mrs. Brooks were right behind Mrs. Carr on the steps. When Mrs. Carr fell, Mr. Carr testified he looked over to Mr. Hunter, "about as far as from here to Roy" (meaning Roy Coyne in the courtroom) and said: "Look here, Walter, this is what Mom fell over, this old shoe right here" and that he looked right at it.

It was Mr. Carr's testimony that he had seen the shoe when he first entered the house but said nothing about it. He gave this testimony:

"Q. After you came back outside, after eating supper, did you see the shoe? A. I never noticed the shoe then.

"Q. And when you went back in after your wife, did you see the shoe, when she was watching television? A. Never noticed, we came by a different place, see.

"Q. Well, you were using the same set of steps all the time, weren't you? A. That's right, but farther over."

Later witness testified that he saw the dog and shoe when he first went in the house, when it was daylight and that he saw the dog was still lying there chewing on the shoe when he went back into the yard after supper. He stated that when he went inside to get his wife to go home he noticed the dog was still there and he said the shoe had to be there because the dog was. When urged by questioning he said, "Yes, I seen the shoe there".

Defendant, John Brooks, testified that he had not seen the old shoe any time during the evening before the accident; that neither Mr. Carr nor anyone else had directed his attention to the shoe. He stated that immediately after Mrs. Carr had fallen he looked to see if she fell over anything but saw nothing, including the shoe. He stated, however, that after Mrs. Carr had gone to the hospital he saw the shoe about two and a half to three feet from the east end of the steps on the ground. His evidence was that he did not hear Mr. Carr make any statement to the effect that the shoe was what caused Mrs. Carr to fall. He testified that the light on the post was sufficient to enable one to see each step and the ground clearly as you walked down the steps; that "it was just as light as day". Mr. Brooks was sitting on the cellar steps at the time of the accident.

The other guests who were present on the evening of the accident testified they had been up and down the rear steps a number of times and observed nothing, including the shoe in question. Walter Hunter stated that with the aid of the outside light he could see each step clearly and the ground clearly. He did not hear Mr. Carr make the statement "Look here, Walter, this is what caused mama to fall".

Mrs. Hunter stated that when Mrs. Carr fell she was coming out the back door and heard Mr. Carr say "Something about the dog" to his wife and that after she had fallen, Mrs. Carr said to her husband "If you had not hollered at me, maybe I wouldn't have fell".

In our opinion we will refer to appellants as defendants and respondents as plaintiffs, the position occupied by the parties in the lower court.

■ On appeal we will review these consolidated actions at law, tried by the court, as suits in equity and will give due regard to the trial court's opportunity to judge credibility of the witnesses and will not set aside the trial court's judgment unless clearly erroneous, but this court will make independent findings of fact and reach its own conclusions on weight of the evidence. Section 510.310 RSMo 1959, V.A.M.S.; Harry M. Fine Realty Co. v. Stiers, Mo. App., 326 S.W.2d 392, 393 [1, 2]; Magers v. Western & Southern Life Ins. Co., Mo.App., 335 S.W.2d 355, 357 [1]; Burrell v. Kaiser's Estate, Mo.App., 344 S.W.2d 622, 624 [1].

Defendants assign as error the action of the trial court in refusing their motions for judgment at the close of plaintiffs' case and in overruling their after-trial motions for judgment in accordance with their motions for judgment at the close of the evidence.

■ Our review of the submissibility of plaintiffs' cases on the theory that the evidence offered failed to make a case requires that we review the evidence in the light most favorable to plaintiffs and give plaintiffs the benefit of all reasonable inferences arising therefrom and disregard defendants' evidence unless it aids plaintiffs' cases. Kirks v. Waller, Mo.Sup., 341 S.W.2d 860, 863 [2, 3]; Daniels v. Smith, Mo.Sup., 323 S.W.2d 705, 706 [2]; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, 633 [3, 4].

Under the evidence it is admitted that plaintiffs were *social guests* in defendants'

home at the time Mrs. Carr fell and was injured. The law governing defendants' legal obligation to plaintiffs as social guests is, likewise, not in dispute. The parties cite practically the same authorities. In plaintiffs' argument, they state on page 5 of their brief:

"Since the authorities cited by both appellants and plaintiffs are largely the same, there is no great difference as to the law applicable to this case. The only question for determination is whether the negligence established by the evidence was *active* or passive. If *active*, the judgment should be affirmed."

In Anderson v. Welty, Mo.App., 334 S.W.2d 132, decided by this court, the question as to whether plaintiff made a submissible case was raised. It was contended that plaintiff was a *bare licensee.* Judge Stone, speaking for the court, stated on page 137 of the opinion:

" * * * As our Supreme Court put it in Menteer v. V. Scalzo Fruit Co., supra, 240 Mo. [177] loc. cit. 184, 144 S.W. [833] loc. cit. 835, a licensee 'may complain of wanton or intentional injury or *active negligence,* * * *' or, as succinctly stated in Twine v. Norris Grain Co., 241 Mo.App. 7, 19, 226 S.W.2d 415, 422(7), 'It is true, of course, that a land occupier is subject to liability for bodily harm caused to a licensee by the *active or affirmative negligence* of the occupier.' * * * So, the familiar statement that a bare licensee takes the premises as he finds them usually has been limited by the equally-familiar exception of 'wantonness, or some form of intentional wrong or *active negligence by the owner or occupier.'*

"[7] As these terms may be used in cases involving the liability of a possessor of premises to one injured thereon, 'active or affirmative negligence' may be defined broadly as negligence occurring in connection with activities conducted on the premises, and 'passive negligence' as negligence which causes danger by reason of the

physical condition of the premises." (See cases cited in footnote 3.)

Wolfson v. Chelist, Mo.App., 278 S.W.2d 39 involved an action by a social guest against the host for injuries sustained when guest stepped on a grease spot on host's porch and fell. The St. Louis Court of Appeals held that the grease spot, caused by feeding a cat on the porch over which social guest passed in entering home and which caused the guest to fall when leaving the home, did not constitute a dangerous condition in the nature of a trap or pitfall nor was it a result of *active or affirmative negligence* on the part of the host. In this opinion the court declared the law on page 44 [9, 10]:

" * * * if the plaintiff was a licensee, as urged by defendant, she took the premises as she found them, and barring wantonness or some form of intentional wrong or active negligence on the part of Bernice, cannot recover for injuries sustained on the premises. * * *

"The universal rule seems to be that a social guest is not an invitee as that term is applied to persons in and upon premises where a business is carried on, but is a licensee, and by some eminent authorities is designated a gratuitous licensee. In 65 C.J.S., Negligence, § 32b p. 487, we find this statement: 'A "gratuitous licensee," or as sometimes called a "permissive licensee," is any licensee other than a business visitor, and includes a social guest;' and in § 32e, p. 489, same authority, we find: 'It has been held that one who comes on premises by express invitation for purely social purposes, to enjoy hospitality as a guest of the owner or occupant, or a guest who enters merely to receive a gratuitous favor from the owner or occupant, has the rights only of a licensee.' " (See authorities cited.)

The Supreme Court in Wolfson v. Chelist, Mo.Sup., 284 S.W.2d 447, 450, stated:

" * * * The word 'invitation' here has been a source of difficulty because of an apparent incongruity in terminology inasmuch as the 'invited' social guest is held to be not an invitee but a licensee. * * " Moss v. Nooter Corporation, Mo.App., 344 S.W.2d 647, 654 [11].

The evidence offered most favorable to plaintiffs revealed that defendants had a dog or pup some six or eight months old; that he had been given a shoe as a pacifier in order to prevent him from carrying clothes off the clothesline. This shoe had been given to him some time prior to the date of accident. On the day of accident plaintiffs were at defendants' home as social guests for supper and sometime during the evening the pup lay down at the foot of the back steps with the shoe; that Mrs. Carr, in taking her departure from defendants' home and, while descending the back steps, stepped on the shoe which caused her to trip, fall and be injured. We think the evidence wholly fails to show that the shoe constituted a dangerous condition in the nature of a trap or pitfall. So, the only question presented is, was there sufficient evidence to show *active negligence* on the part of defendants?

"Active or affirmative negligence", for which an occupant may be liable to his social guests or licensees, has been defined "as negligence occurring in connection with activities conducted on the premises," and "passive negligence," for which an occupant is not liable to his social guests and licensees, is defined "as negligence which causes danger by reason of the physical condition of the premises". Anderson v. Welty, supra, 334 S.W.2d p. 137 [7]; Porchey v. Kelling, 353 Mo. 1034, 185 S.W.2d 820; Wolfson v. Chelist, Mo.Sup., supra.

Plaintiffs rely on Anderson v. Welty, supra, Porchey v. Kelling, supra, and Wolfson v. Chelist, supra, as authorities to sustain their contention that the evidence offered did show *active negligence* on the part of defendants. An examination of these authorities does not support plaintiffs' contention. However, in plaintiffs' argument they contend that a social invitee

is owed a greater duty than a bare licensee. They rely on Glaser v. Rothschild, 221 Mo. 180, 120 S.W. 1. On page 3 of the opinion it is stated:

" * * * A bare licensee (barring wantonness, or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as he finds them. * * *

"But the situation, with reference to liability, radically changes when the owner invites the use of his premises for purposes connected with his own benefit, pleasure, and convenience. That change calls into play other rules of law, in order to do full and refined justice. The rule applicable to that change is that a licensee, who goes upon the premises of another by that other's invitation, and for that other's purposes, is no longer a bare licensee. He becomes an invitee, and the duty to take ordinary care to prevent his injury is at once raised, and for the breach of that duty an action lies."

Wolfson v. Chelist, supra, Mo.Sup., 284 S.W.2d 447, in passing upon a question of an invitee or licensee, the court re-examined the Glaser case, supra, and disapproved of this very language. So, we think the Glaser case is not the law in Missouri as shown by the quotation from that opinion.

In Wolfson v. Chelist, supra, a guest sustained injuries when she stepped on a grease spot on the host's porch and fell. The grease spot was caused by feeding a cat and the guest, while entering the home, passed over the spot and fell. The court held that this did not constitute a dangerous condition in the nature of a trap or pitfall and was not affirmative negligence on the part of the host.

Warner v. Lieberman, D.C., 154 F.Supp. 362, involved an action for injuries by plaintiff who was a gratuitous guest at defendants' home. The defendants had a chaise longue with three missing bolts in one of the legs so that on occasions and given the right impetus, the leg would swing out, and this condition had existed for some two seasons but there had been no previous injury in the use of the longue. Defendants were aware of the condition but notwithstanding such condition they used the longue. Plaintiff was injured by tripping over this leg when it swung out. The court held defendants were not liable.

Page v. Murphy, 194 Minn. 607, 261 N.W. 443 involved a case where the hostess' children had strewn the floor with beans which they had been shooting about and had tracked in water. An eighty year old social guest, en route to the living room from the bathroom, slipped on the beans and water and was injured. It was held that defendants were not liable to the social guest.

Bogateroff v. Caplan, Sup., 108 N.Y.S.2d 205 involved facts where a child left a regulation soft ball on the rear lawn when the game was over. Thereafter, plaintiff, a social guest, fell on the ball and was denied recovery for the injury. (See similar cases in annotation in 25 A.L.R.2d 600.)

Under the facts in the instant cases the trial court should have sustained defendants' motion for directed verdict for the reason that plaintiffs failed to make a submissible case. The evidence considered most favorable to plaintiffs does not show *active or affirmative negligence* for which defendants may be liable to plaintiffs as their social guests or licensees. The leaving of the shoe by the dog at the foot of the steps was not an act of negligence occurring in connection with activities conducted on the premises. Plaintiff's injuries were the result of danger by reason of the physical condition of such premises.

Having found that plaintiffs failed to make a submissible case it is unnecessary to pass upon the other alleged errors.

Judgment in each of the above cases is reversed and remanded with directions that the trial court's judgments be set aside and judgment entered in each of said causes in favor of the defendants.

**300**

RUARK, P. J., concurs.

STONE, J., concurs in result.

STONE, Judge (concurring in result).

I concur in the result reached in the principal opinion. However, after quoting from Glaser v. Rothschild, 221 Mo. 180, 120 S.W. 1, 3, 22 L.R.A.,N.S., 1045 (upon which instant plaintiffs rely), the principal opinion states that, in Wolfson v. Chelist, Mo., 284 S.W.2d 447, "the court re-examined the Glaser case, supra, and disapproved of this very language" and that "we think the Glaser case is not the law in Missouri." I do not so read or understand the Wolfson opinion. Rather, it appears to me that the court there *disagreed with plaintiff's-respondent's counsel* (as I disagree with counsel for instant plaintiffs-respondents) as to the meaning to be attributed to the quoted language in Glaser, but in no wise indicated any intention to disapprove that language (when read in the light of the facts there involved), to overrule or even criticize Glaser, or to weaken or undermine its established status as a leading case in this jurisdiction. Witness precisely what was said in Wolfson, supra, 284 S.W.2d loc. cit. 449: "We are not inclined to agree that the language of the Glaser opinion * * * is substance for the belief that the author of the opinion and this court had in mind an entrant's visit with the 'purpose' of the enjoyment of the social relationship of host and guest. Nothing in the language of the whole opinion so indicates. And the opinion did not treat with such a factual situation." I think that Shepard's Missouri Citations properly and accurately records Glaser as *explained* by Wolfson. As Shepard's also demonstrates, exceedingly few cases of Glaser's vintage continue to be cited so frequently with approval and to remain so favored an authority in this field. With Glaser having been cited in at least nine cases since Wolfson, I cannot subscribe to any comments suggesting that Glaser has been "disapproved" in any respect or "is not the law in Missouri."